[No. B082583. Second Dist., Div. Three. Mar. 28, 1996.]

ROBERT J. O'CONNOR, Plaintiff and Appellant, v.
STATE TEACHERS' RETIREMENT SYSTEM, Defendant and
Respondent.

[No. B083642. Second Dist., Div. Three. Mar. 28, 1996.]

L. EDMUND KELLOGG, Plaintiff and Respondent, v.
STATE TEACHERS' RETIREMENT SYSTEM, Defendant and Appellant.

**COUNSEL**

Robert J. O'Connor, in pro. per., for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Floyd D. Shimomura, Assistant Attorney General, Linda A. Cabatic and Keith Yamanaka, Deputy Attorneys General, for Defendant and Appellant and for Defendant and Respondent.

L. Edmund Kellogg, in pro. per., and Harvey Goldhammer for Plaintiff and Respondent.

**OPINION**

**ALDRICH, J.—**

### INTRODUCTION

These two consolidated appeals involve the calculation of retirement allowance for a member of the State Teachers' Retirement System (STRS) who holds two full-time teaching positions simultaneously. Both actions arose after the member-teachers filed petitions for writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5.

In the first lawsuit, L. Edmund Kellogg requested an administrative hearing after the STRS Board informed him it had calculated his retirement benefits based on one of his two full-time positions only and considered the other full-time position to be overtime. After the administrative law judge ruled in favor of STRS and the Teachers' Retirement Board Benefits, and

Services Committee adopted the decision, Kellogg filed a petition for writ of mandate. The trial court granted the writ finding in favor of Kellogg, that the calculation of his retirement allowance should be based on both full-time teaching positions. STRS has appealed.

In the second action, under the same circumstances, the administrative law judge ruled, as had the administrative court in Kellogg's case, in favor of STRS, rejecting Robert J. O'Connor's challenge to STRS's method of calculation. However, unlike Kellogg's case, the trial court denied O'Connor's petition for writ of mandate. O'Connor filed this appeal.

Pursuant to the State Teachers' Retirement Law, Education Code section 22000 et seq.,[1] we hold the trial court in O'Connor v. STRS correctly concluded as a matter of law, that STRS should calculate a teacher's retirement allowance based on the aggregate of the teacher's salaries up to the equivalent of a single, full-time job carrying the highest compensation. We therefore further hold the conclusion of law of the trial court in Kellogg v. STRS that the STRS Board must calculate the member's retirement allowance based on both full-time positions was error. Accordingly, the judgment in Kellogg v. STRS is reversed and the judgment in O'Connor v. STRS is affirmed.

FACTUAL AND PROCEDURAL SYNOPSIS

### A. *STRS.*

STRS is the state agency responsible for managing contributions made by employees and member school districts to the State Teachers' Retirement Fund (the Fund). There are 1,190 such districts, including the Los Angeles Unified School District (LAUSD), the Los Angeles Community College District (LACCD) and the Pasadena City College District (PCCD). The large school districts report directly to STRS while the smaller ones funnel their reports through their respective counties.

STRS is managed by the Teachers' Retirement Board (the Board) (§ 22200). The Board's duties include receiving and investing contributions

---

[1]While these cases were pending, the Legislature significantly reorganized the Education Code with the specific intent to ". . . clarify the State Teachers' Retirement Law and thus facilitate its administration. It is not the intent of the Legislature to make any substantive change in the law." (Historical and Statutory Notes, 26B West's Ann. Ed. Code (1994 ed) § 22000, p. 220; Stats. 1993, ch. 893, § 3. (Assem. Bill No. 1796).) Since 1993, the Legislature has further revised the law in ways which do not affect the outcome of this appeal.

Hereinafter, all statutory references shall be to the reorganized and renumbered version of the Education Code passed in 1993, unless otherwise noted.

from members and employers, and calculating and paying retirement allowances.

### B. *L. Edmund Kellogg.*

Kellogg initially became a member of STRS in the early 1970's and had been employed by PCCD as a full-time professor since 1975. In 1986, while still employed full-time at PCCD, Kellogg accepted a separate teaching position at Los Angeles Mission College, in the LACCD. In 1988, the latter position expanded to full-time status. Both employers are member districts in the retirement benefits plan administered by STRS. Mandatory contributions were made from Kellogg's salaries at both PCCD and LACCD to invest in the Fund. Upon his employment, Kellogg notified the people who hired him at Los Angeles Mission College of the fact he was also employed at PCCD. Kellogg's new contract contained the clause, " 'I am not under contract to provide services for any other school district during the period of this agreement[.]' " Kellogg crossed out this sentence and initialed his deletion. In such form, Kellogg's employers at Los Angeles Mission College signed the contract.

On February 24, 1992, Kellogg requested STRS calculate his retirement benefits based on the combined salaries from both employers of $90,000. STRS informed Kellogg that pursuant to the Education Code he would only be credited for the salary from the equivalent of one full-time teaching position and that the remainder of his salary was considered "overtime" which is not creditable to his retirement allowance. Kellogg requested an administrative hearing.

### C. *Robert J. O'Connor.*

O'Connor was employed in four separate school districts during his 24-year teaching career. O'Connor was a teacher in the LAUSD for 17 years, and in LACCD for 24 years. Since the 1988-1989 academic year, O'Connor has been employed full-time by both districts concurrently. Mandatory contributions were made to O'Connor's STRS account during all of the years he was employed in each position.

On May 14, 1992, O'Connor requested STRS calculate his retirement benefits. In response, STRS informed O'Connor he would be credited only the benefits from his position at LACCD.

Insisting STRS should compute his service retirement allowance based on the sum of his two salaries for the years immediately antedating his retirement, O'Connor requested an administrative hearing. O'Connor's hearing was held one day after Kellogg's.

D. *The Hearings.*

The same witnesses testified at both hearings.

Alfred L. Ray III, manager of the service retirement section responsible for calculating estimated retirement allowances for employees who apply to STRS, explained the method for computing retirement benefits is determined by statute. The benefit is based on "final compensation," which is the average salary earnable for the highest three consecutive years of credited service. STRS calculates the benefit as 2 percent of "final compensation" multiplied by the number of years of the employee's service. Service is based on work in a position requiring membership in STRS. There is no restriction on the number of years of service that can be credited to an employee.[2] A member, i.e., employee, will earn service credit and receive a retirement allowance so long as the required contributions are paid to STRS.

Other factors however limit the size of an employee's retirement allowance. For example, Ray explained, STRS cannot calculate retirement allowance based on *actual earnings* because the statute's definition of "final compensation" utilizes the word "earnable" salary not actual "earning."

When an employee's annualized earnings are greater than the maximum salary earnable in one full-time position, STRS will generally credit to the member's retirement allowance the service from the position with the higher pay rate so as to give the member the advantage. To the extent the earnings are in excess of the annualized rate of one full-time position, the "excess" is credited as "overtime." Overtime may not be used to calculate the employee's retirement allowance.

Each member has one STRS account regardless of the number of jobs the member holds and regardless of the number of employers for which that member works. STRS receives salary and wage reports from each district for each employee. When an employee holds jobs with two separate school districts or counties which contribute to the system, STRS receives two reports. Pete Hough, chief of STRS's membership division, audits the reports of employees' earnings to identify those salaries which are greater than the maximum earnable amount, and to ascertain those employees who work for more than one employer.

According to Hough, STRS has known since 1972, there are teachers in the system who work for more than one employer. *However, that situation*

---

[2]Therefore, under the benefit formula, a teacher who is more than 80 years old can receive more in retirement than during service.

*has never before caused STRS a problem.* First, Hough's division audits the reports of employees' earnings. Second, for several years, the reports have been funneled through the large employers, such as the counties, to STRS. STRS relies on the counties to notify the employer school district when one of the salaries is considered noncreditable "overtime." Finally, a standard item covered in all brochures and training documents STRS sends to employers is a notification about members holding two jobs. Hence, STRS has not proposed legislation to clarify the definition of compensation for a full-time employee.

Mark Oliver Johnson, an actuary with the firm of Milliman and Robertson which consults for STRS, explained his firm conducts valuations to determine whether contributions are sufficient to meet demand. The actuaries predict the amount of benefits which will eventually be paid out and evaluate the adequacy of the contributions to fund those benefits. The actuaries' forecast of future benefits is based on certain assumptions, such as the ages at which members will retire, how long they will live after retirement, the probability members will become disabled or leave the system, salary growth, cost of living and interest earnings on the Fund. *The actuarial assumptions are also based on STRS's definition and interpretation of full time, overtime and "compensation earnable."*

According to Johnson, contributions to the system are set by statute. The effect of an employee's receiving two full-time salaries is to "spike" the variables and render prediction more difficult. The earlier a spike occurs, the sooner it will be identified. Theoretically then, contributions to the system could be increased in time to pay for the higher benefits. But identification does not alleviate the problem. Johnson explained insufficiency of funds occurs because final average compensation is leveraged against all the years of service. Where a member has two full-time positions for only a portion of the member's career, the school district and member could contribute more but never come close to funding that additional benefit level. "If the average earnable salary is increased by one or two percent on average, the funding of the system will be in jeopardy." Hence, it would take only three thousand incidents of employees holding two full-time positions with two employers at the end of their careers to threaten the system.

E. *The Rulings.*

1. *Kellogg.*

The administrative law court held, based on sections 22115 and 22133, STRS properly calculated Kellogg's retirement allowance by crediting earnings for the equivalent of one full-time position per year. That court rejected

Kellogg's argument that the law places no limits on the compensation which may be earned by a full-time employee or on the number of employers for which said employee may work. Rather, the administrative law court concluded there is no provision in the statutory scheme for Kellogg to claim entitlement to two separate retirement allowances for two separate full-time positions. The fact that excess contributions had been made to the Fund was not fatal to STRS's position. The administrative law court noted, "[t]he legislature anticipated a situation just like applicant's in its enactment of section [22906]. Said section allows the System to return contributions made for which the member will not receive a benefit, which excess contributions may even be returned as late as the retirement date."[3]

The Teachers' Retirement Board Benefits and Services Committee adopted the decision of the administrative law court. Kellogg filed his petition for alternative writ of mandate in the superior court (Code Civ. Proc., § 1094.5).

Kellogg's petition was granted by the trial court. Focusing on the provisions for computing service credit, the court stated in its notice of ruling, "In exercising its independent judgment, the Court finds that the weight of the evidence does not support the decision of [STRS] under Education Code [section 22702] and [section 22701]. . . . [Kellogg] is entitled to credited service for his total compensation from both jobs." The court explained, "Education Code [sections 22133 and 22115] . . . defines [sic] 'final compensation' as the highest average annual compensation earnable by a member during any period of three consecutive years if the member were engaged in their duties on a full-time basis. Respondent in denying compensation relies on [section 22115] which defines full time service . . . . [¶] Respondent[']s argument that [Kellogg] was not required to work the second job is irrelevant. *Each employment should be considered separately.* They were in fact separate jobs. . . . While it might not have been 'normal' for employees to hold two positions [STRS] presented no evidence which suggests that [Kellogg] did not act as similarly situated employees in both positions." (Italics added.) Continuing, the court reasoned, Kellogg was not engaged in overtime work, but in separate full-time employment: "There is nothing in the record to suggest that it was 'overtime' employment. He received two separate paychecks and in fact monies for this fund were taken from both. He actually engaged in 'overtime' on a single job."

---

[3]Section 22906 provides, "If at the time of retirement, disability, or death, there are contributions remaining to the credit of the member that were made with respect to time on the basis of which the member will not be entitled to receive a benefit, the [B]oard shall refund to the member accumulated contributions as it may allocate to the time."

Finally, the court concluded, "Respondent[']s interpretation would restrict [Kellogg] to an artificial limitation which is not in the statute," and ruled STRS ". . . should take into account both paychecks in calculating the three highest years for retirement and make calculation's [*sic*] for benefits in accordance with this judgment."

Judgment was entered and STRS filed its timely appeal.

2. *O'Connor.*

A different administrative law judge reached the same conclusion as the administrative law court had in Kellogg's case, namely, STRS had properly calculated O'Connor's retirement allowance by giving credit to earnings for the equivalent of one full-time position per year. That court rejected O'Connor's argument that the law places no limits on compensation which may be earned by a full-time employee or on the number of employers for which such employee may work. The court explained, by its plain language section 22115 defines full-time service and compensation earnable in terms of the member's earnings ". . . *with one particular employer* under terms and conditions of employment which are similar to those of similarly-situated employees." (Italics added.) Hence, earnings in excess of compensation earnable are more properly deemed "overtime" under section 22151. Also as in Kellogg's case, the administrative law judge concluded it was of no moment that contributions have been made from all of O'Connor's earnings because section 22906 provides for reimbursement to the member for non-credited overpayments as late as the employee's retirement date.

The Teachers' Retirement Board Benefits and Services Committee adopted the above decision and O'Connor filed his petition for alternative writ of mandate.

O'Connor's petition was denied by the trial court which ruled STRS's statutory interpretation was correct. Further, O'Connor's equal protection argument failed because all members of the system are treated equally. "The fact that some members choose to take themselves outside the scope of the statutory coverage by increasing their income, in whatever way they can, does not call into play 'equal-protection' violations." The remainder of O'Connor's positions were deemed meritless. O'Connor filed his timely appeal.

We have consolidated the two appeals.

## Discussion

### 1. *Standard of Review.*

■ There is no dispute Kellogg and O'Connor have a fundamental vested right in the Fund to the amount to which they are entitled by law. (*Purdy* v. *Teachers' Retirement Board* (1980) 113 Cal.App.3d 942, 949 [170 Cal.Rptr. 360]; *Quintana* v. *Board of Administration* (1976) 54 Cal.App.3d 1018, 1023 [127 Cal.Rptr. 11].) "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment." (*Betts* v. *Board of Administration* (1978) 21 Cal.3d 859, 863 [148 Cal.Rptr. 158, 582 P.2d 614]; *California Teachers Assn.* v. *Cory* (1984) 155 Cal.App.3d 494, 506 [202 Cal.Rptr. 611].)

■ Under section 1094.5 of the Code of Civil Procedure, in all cases concerning a fundamental vested right, the trial court must exercise its independent review of the evidence admitted at the administrative hearing, and it shall find an abuse of discretion if the findings are not supported by the evidence. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44-45 [112 Cal.Rptr. 805, 520 P.2d 29].)

■ On appeal from the grant or denial of a petition for administrative mandate, the appellate court reviews the record to determine whether substantial evidence supports the trial court's findings. (*Quintana* v. *Board of Administration, supra,* 54 Cal.App.3d at p. 1024.) "However, this court is not bound by the trial court's findings to the extent they constitute conclusions of law." (*Purdy* v. *Teachers' Retirement Board, supra,* 113 Cal.App.3d at p. 949.) Interpretation of a statute is a question of law.

■ ". . . '[I]n determining the proper interpretation of a statute and the validity of an administrative regulation, the administrative agency's construction is entitled to great weight, and if there appears to be a reasonable basis for it, a court will not substitute its judgment for that of the administrative body.' [Citations.] In addition, an administrative ruling ' "comes before the court with a presumption of correctness and regularity, which places the burden of demonstrating invalidity upon the assailant [fn. omitted]." ' [Citations.]" (*Campbell Industries* v. *State Bd. of Equalization* (1985) 167 Cal.App.3d 863, 868 [213 Cal.Rptr. 533].)

Nonetheless, ". . . the foregoing 'rule of liberal construction . . . should not blindly be followed so as to eradicate the clear language and purpose of the statute. . . . [Citations.]' [Citation.] . . . 'The ultimate interpretation of

a statute is of course an exercise of judicial power and it is the responsibility of the courts to declare its true meaning even if it requires rejection of an earlier erroneous administrative interpretation. [Citations.]' [Citations.]" (*Wheeler* v. *Board of Administration* (1979) 25 Cal.3d 600, 605 [159 Cal.Rptr. 336, 601 P.2d 568].)

With these rules in mind we turn to the State Teachers' Retirement Law.

### 2. *Calculation of Retirement Benefits.*

STRS and teachers' retirement benefits are statutorily driven by a comprehensive legislative scheme known as the State Teachers' Retirement Law (hereafter sometimes the statute). (Cf. *California Teachers Assn.* v. *Cory, supra*, 155 Cal.App.3d at pp. 500-503.)

In construing a statute, we must ". . . ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] . . . [T]o determine this intent, we [must examine] the language of the statute. [Citations.]" (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420].)

Turning to the entire scheme of the State Teachers' Retirement Law, with an eye toward harmonizing all of its parts (*People* v. *Pieters, supra*, 52 Cal.3d at p. 899), we hold the statute provides an employee's retirement allowance be based on a single, full-time position.

To compute the retirement allowance of an employee, the Board starts with chapter 27, entitled "Service Retirement." Section 24202, subdivision (a)(1) provides the allowance is "2 percent of the *final compensation* for each year of *credited service*." (Italics added.) Allowance is based on two variables, "final compensation" and "credited service," both of which factors operate to limit the amount of allowance an employee may receive to no more than a full-time position.

The first variable, "final compensation," is defined as "the highest average annual *compensation earnable* by a member during any period of three consecutive years during his or her membership in the system. . . ." (§§ 22133, subd. (a), 22135, subd. (a), italics added.)[4] "Compensation earnable" by a full-time member is "the compensation as determined by the

---

[4]Section 22135 defines final compensation for classroom teachers as, "the highest annual compensation earnable by a member who is a classroom teacher . . . during any period of 12 consecutive months during his or her membership in the system."

board that *would have been earned* by the member *if* he or she were engaged in his or her duties on *a* full-time basis." (§ 22115, subd. (a), italics added.) Ray's testimony supports the conclusion, by utilizing the word "earnable," the statute limits the compensation on which retirement allowance may be based to that which the teacher may earn, not what the teacher actually earned, "on *a* full-time basis." (*Ibid.*, italics added.) Therefore, the pay used to calculate earnable compensation is limited to the amount paid in a single, full-time position.[5]

The second variable, "service credit" is also capped at the equivalent of one year of service in *a* single full-time position. Service for a full-time employee is ". . . credited in the proportion the compensation paid bears to the compensation the member *would have received if he or she had been employed on a full-time day basis in the particular position in which he or she is employed throughout the school term*, school year, or for a period of service at least the equivalent to a school term." (§ 22701, subd. (b), italics added.)[6] Most important, the statute places an overall limit on the amount of service that may be credited toward retirement. "Service shall be computed by school years and not by calendar years, portions of years served being accumulated and counted as service. *All of the service performed during any one school year in a position requiring membership in this system shall not count for more than one year.*" (§ 22703, subd. (a), italics added.)

Hence, O'Connor's and Kellogg's contention there is no statutory limit on the number of employers a member may have is correct but does not change the result. While there is no limit to the number of member employers an employee may work for, there *is* a limit on the amount of service and compensation which is creditable to the employee's retirement allowance. To summarize, the State Teachers' Retirement Law specifically limits the total amount of service credit a member may earn, doing so by utilizing one

---

[5]In 1993, the Legislature amended section 22114, subdivision (a)(1) to add the italicized phrase: " 'Compensation' and 'salary,' for the purposes of determining benefits and contributions, mean: . . . [¶] (1) Remuneration in cash payable by the employer to the member *for actual work performed or time served, up to the full-time equivalent for the position.*" In adding the italicized phrase limiting remuneration "up to the full-time equivalent," the Legislature stated ,"This bill would . . . prohibit the making of ad hoc adjustments to compensation when the purpose is to enhance retirement benefits." (Stats. 1993, ch. 468, § 1 (Assem. Bill No. 631).) Accordingly, we construe the Legislature's purpose in amending section 22114, subdivision (a)(1) was to clarify that compensation would include remuneration up to *but no more than* the full-time equivalent for the position.

[6]Section 22701 is not aimed at part-time employees. There is a separate provision for crediting part-time employees: section 22702 states, "Persons employed on a part-time basis, . . . shall receive credit for time served in the proportion that the salary earned bears to the salary that would have been earned if employed full-time. . . ." Therefore section 22701 applies to full-time employees.

full-time position as the yardstick. A member may earn no more than one year of credited service in any one academic year, regardless of the amount of work that member actually performed and regardless of the number of jobs that member actually held.

Remuneration paid in excess of the full-time equivalent for the position is therefore not creditable to retirement allowance. The statute considers such excess earnings to be "overtime." (§ 22151.) Money paid to an employee for overtime service is not included in the definition of compensation. (§ 22114, subd. (b)(2).) "Overtime" is defined as "the aggregate service performed as a member of the system in excess of the hours of work considered normal for employees on *a* full-time basis." (§ 22151, italics added.)

We construe the entire statute to provide an employee credit up to a single, full-time position, and all remaining pay is considered noncreditable overtime. Our reading of the law comports with (1) the evidence, (2) the interpretations of both administrative judges and (3) the trial court's conclusions in O'Connor v. STRS. Finally, this result corresponds to the interpretation of the complex statutory scheme by the STRS Board charged with implementing the statute, to which we give great weight. (See *Wheeler* v. *Board of Administration, supra,* 25 Cal.3d at p. 605.) The uncontradicted testimony of the STRS employees shows for *over 30 years* STRS has consistently interpreted the statute in this fashion.

Both the trial court in Kellogg v. STRS and Kellogg are therefore incorrect in concluding Kellogg held two full-time positions for which no work could be allocated to overtime with the result that each position should be considered *separately* for purposes of calculating his retirement allowance. Each member holds *one* account in STRS, regardless of the number of jobs and employers that member has. The reason is public school teachers earn "credited service" regardless of which or for how many member districts the employees work. Service is based on the work in a position for which membership in the system is required, not the number of employers, or work performed for a particular employer. (§ 22120.)[7] Moreover, overtime, which is not credited to an employee's retirement allowance, is specifically defined as the "aggregate service performed *as a member of the system.* . . ." (§ 22151, italics added.) Stated otherwise, overtime is defined as the excess of all of the work performed in all jobs which contribute to the system, not just the excess pay from one single job. Likewise, all positions for which

---

[7]Section 22120, now renumbered 22121, provides, " 'Credited service' means service for which the required contributions have been paid and shall be used in determining a member's eligibility for any allowance provided by this part."

contributions to the system are required must be considered in the formula which establishes what is creditable.

The logic behind our statutory construction is further underscored by the fact, as noted by both administrative law judges and one trial court, money contributed to the system in excess of that which is creditable to retirement allowance must be reimbursed at the time of retirement. (§ 22906.) O'Connor's and Kellogg's arguments they were never informed they were contributing excess, noncreditable money to the system, is, in light of section 22906, unpersuasive.[8]

O'Connor contends his second full-time position cannot be considered overtime without redefining "overtime" in violation of the statute, because both of his positions are considered full-time. O'Connor and Kellogg argue essentially only the employing school district, not STRS, can determine what is considered overtime.

Overtime, for purposes of the State Teachers' Retirement Law, is not defined as that which the *employer* considers overtime: it is the province of the Board to determine what pay is creditable to retirement. Section 22215 provides "[t]he *board* shall determine the service performed by members to be credited toward qualification for retirement, and shall fix retirement allowances, . . ." (Italics added.) Furthermore, "compensation earnable" is defined as that compensation *"as determined by the board* that would have been earned by the member if he or she were engaged . . . on a full-time

---

[8]Equally unpersuasive is Kellogg's argument that STRS is estopped from designating his second full-time position as "overtime" for purposes of calculating his retirement allowance because of ". . . STRS's intentional delay in informing Kellogg of its position concerning Kellogg's alleged excess pension fund contributions, and its failure to return any of the alleged excess pension fund contributions to Kellogg." *STRS is not required to refund the money until such time as the employee retires.* The statute provides, "If *at the time of retirement,* . . . there are contributions remaining to the credit of the member that were made with respect to time on the basis of which the member will not be entitled to receive a benefit, the board shall refund to the member accumulated contributions as it may allocate to the time." (§ 22906, italics added.) Otherwise, the uncontradicted evidence demonstrates STRS audits employers' reports to identify excess contributions, and notifies the county employers in such a situation so the employer may make the necessary adjustments and cease contributing excess, noncreditable salary to STRS. Hough testified STRS had informed LACCD Kellogg's service for that school district was considered noncreditable "overtime." It was up to the district employers, not STRS to make adjustments. Furthermore, counsel for STRS represented, and we accept, that interest will be paid on the amounts improperly withheld under section 22906. Section 22102 provides, " 'Accumulated retirement contributions' means the sum of all member contributions and all member contributions paid by the employer pursuant to Sections 22903 and 22904 with credited interest and does not include accumulated annuity deposit contributions and accumulated tax-sheltered annuity contributions."

basis." (§ 22115, subd. (a), italics added.) STRS is actually precluded by statute from crediting O'Connor for work performed in *excess of that which is earnable as determined by the board.* (*Ibid.*)

Nor does *Purdy v. Teacher's Retirement Board, supra,* 113 Cal.App.3d 942 preclude this result. O'Connor argues STRS has made the same transgression ruled improper in *Purdy. Purdy* does not concern the calculation of final compensation in two full-time positions. Purdy's employer had designated her as a " 'full-time salaried employee in one full-time position' " while STRS decided Purdy was holding a multiple-position assignment on an as-needed basis, paid on an hourly and daily basis. (*Id.* at p. 950.) Based on this label, STRS calculated Purdy's retirement by reference to the statutory provisions for part-time employees. The reviewing court ruled STRS had improperly applied the part-time statute for a full-time employee. (*Id.* at p. 953.)

Here, STRS has not redefined O'Connor or Kellogg as part-time employees. Nor did STRS apply the separate statutory provisions for part-time employees or redefine what is overtime. (See, e.g., § 22116, compensation earnable, part-time employees.) Rather, STRS has applied the definition of compensation earnable and final compensation for full-time employees, and designated O'Connor's and Kellogg's aggregated time in excess of such work as noncreditable "overtime" in full compliance with section 22151.

O'Connor next contends STRS's interpretation denies him due process and equal protection because he works for a school district which limits the number of credited hours in a week and year to fewer than other districts. We disagree.

The same calculation is employed for all teachers falling under the same category. Actually, were we to hold, as O'Connor would have us, that he should be given credit for both full-time positions, then other employees working the same number of hours and making the same amount of money would be treated differently than O'Connor and Kellogg because they worked in multiple *part-time* positions as opposed to two full-time positions. The system was clearly designed to effectuate the fairest disposition for all teachers similarly situated.

It is well settled "[l]aws relating to pension and retirement benefits are to be liberally construed to the end that the beneficent aims of such legislation may be achieved. [Citations.]" (*Wheeler v. Board of Administration, supra,* 25 Cal.3d at p. 604.) Section 22001 proclaims the purpose of the STRS is "to provide a financially *sound plan for the retirement,* with

*adequate retirement allowances*, of teachers in the public schools of this state, teachers in schools supported by this state, and other persons employed in connection with the schools, the State Teachers' Retirement System is established." (Italics added.) Two objectives are also served by pension plans for public employees: ". . . '. . . to induce persons to enter and continue in public service, and to provide subsistence for disabled or retired employees and their dependents. [Citation.]' [Citation.]" (*Wheeler* v. *Board of Administration, supra*, 25 Cal.3d at p. 605.)

STRS's actuaries calculated STRS had an unfunded obligation of $11 billion because the current members' contributions are less than that needed to meet the normal cost payment. In response, the actuary explained, the Legislature addressed this shortfall by enacting former sections 23402 and 23403, which, among other things, is designed to provide stable and full funding over the long term. Both former section 23402 and the actuaries' calculations are based on the assumption, among others, that final compensation was being calculated based on one full-time position or the equivalent thereof.

As of 1993, the system was "in a funded position," that is, members were contributing the exact percent of earned salary and the Fund is earning just the right interest rate so there will be sufficient amount of money to pay for the anticipated benefits. However, despite the efforts of the Legislature, ". . . if the earnable salary were to increase but just a matter of a few percentages on average, the system would no longer fund. [That is,] . . . the $11 billion liability would increase to some level to which it would not be able to amortize, and the shortfall would continue to increase every year." Therefore, to allow the calculation of benefits based on two full-time positions would contradict and frustrate the intent of the Legislature, in enacting former section 23402 to make the Fund solvent.

Indeed, to conclude otherwise would be to grant Kellogg and O'Connor a windfall. The statute provides for a calculation based on the highest average annual compensation earnable during three consecutive years of credited service. (§ 22133, subd. (a).) In both cases before us, the employee worked for many years at one salary and only in the last few years took a second full-time position. Kellogg had seventeen years of service and maintained two full-time jobs in only the last *four* years. O'Connor had twenty-four years of service and only in the last *four* years did he work on a full-time basis in two jobs. For the overwhelming majority of their years of service these employees contributed only from one position. To grant them a benefit based on the highest three years from two positions would be to give them a

retirement allowance wholly out of proportion to the amounts they had contributed for the overwhelming majority of years of service, to the detriment of the Fund and of the other contributors. In the words of the actuary, ". . . a person who worked an entire career in one position and then at the last 3 years, took a second position . . . would double the entire pension that would have been earned over the 30 years just by having three years at twice the salary." Not only is this unsupported by the statutory scheme we construe the Legislature to have designed, but would result in speedily bankrupting the STRS.

We therefore hold the statute requires STRS to calculate Kellogg's and O'Connor's retirement allowance based on the aggregate of the teacher's salaries up to the equivalent of a single, full-time position. Our holding not only comports with the clear language of the State Teachers' Retirement Law, the application of that law by STRS, and former section 23402, but achieves the ends to which the statute was aimed, namely to provide a " 'substantial or reasonable pension' " (*Betts* v. *Board of Administration*, *supra*, 21 Cal.3d at p. 863), for retirees, while assuring adequate funding of the entire system.

## DISPOSITION

The judgment in Kellogg v. STRS (No. BS025808) is reversed and the trial court is directed to recall the writ of mandate issuing over date of February 16, 1994. The judgment in O'Connor v. STRS (No. BS026387) is affirmed. Each party to bear his own costs.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied April 23, 1996, and the petitions of both appellant and respondent for review by the Supreme Court were denied June 26, 1996. Mosk, J., did not participate therein.