[No. B222370. Second Dist., Div. Three. Sept. 29, 2011.]

PHILLIP MOLINA, Plaintiff and Appellant, v.
BOARD OF ADMINISTRATION, CALIFORNIA PUBLIC EMPLOYEES'
RETIREMENT SYSTEM et al., Defendants and Respondents;
CITY OF OXNARD, Real Party in Interest.

54

## COUNSEL

Law Offices of David A. Roberti, David A. Roberti; Law Offices of John Michael Jensen and John Michael Jensen for Plaintiff and Appellant.

Peter H. Mixon, Marguerite Seabourn; Steptoe & Johnson, Edward Gregory and Jason Levin for Defendants and Respondents.

Kinaga Law Firm, Patricia A. Kinaga and Arthur B. Walsh for Real Party in Interest.

OPINION

**CROSKEY, J.**—Phillip Molina (Molina) appeals from a judgment denying his petition for a writ of mandate (Code Civ. Proc., § 1094.5). By that petition, Molina had sought to compel the inclusion in the calculation of his retirement pension all, or at least some portion of, the settlement proceeds received in the negotiated resolution of his wrongful termination action against the City of Oxnard. Because we agree with the trial court that (1) given the explicit language of the integrated settlement agreement between Molina and the City of Oxnard, the settlement proceeds constitute neither "payrate" nor "special compensation" and therefore are not taken into consideration as "compensation earnable" for purposes of Molina's "final compensation" and (2) under applicable state law, such settlement proceeds may thus not be legally utilized to increase Molina's pension benefits, we will affirm the judgment.

## *FACTUAL AND PROCEDURAL BACKGROUND*[1]

In November of 1999, Molina was terminated from his employment as the Director of Finance and Administrative Services of the City of Oxnard (Oxnard). He is a certified public accountant and, for over 18 years, he had been employed by various public entities, all of which were a part of California's Public Employees' Retirement System (CalPERS).

About six months after his termination by Oxnard, Molina was hired by the Los Angeles County Office of Education (LACOE), an entity that also participated in CalPERS. In February or March of 2001, he left that position and applied for and was awarded a pension by CalPERS later that year. That pension became effective on December 1, 2001, and was based on his years of service with participating public agencies, including Oxnard and LACOE.

In the meantime, however, on March 3, 2000, Molina had filed an action for wrongful termination against Oxnard in the United States District Court for the Central District of California.[2] This action was resolved by settlement

---

[1] The factual and procedural background is taken primarily from the one-volume administrative record that was before the trial court and from the trial court's opinion. Along with these documents, a two-volume clerk's transcript and a one-volume reporter's transcript compose the entire record before us.

[2] The trial court below summarized the procedural history of this federal action as follows: "[Molina] sued . . . Oxnard . . . for wrongful termination in violation of his constitutional right to freedom of speech. The District Court granted summary judgment in favor of the City of Oxnard, and petitioner appealed to the Ninth Circuit. On January 8, 2003, the Ninth Circuit Court of Appeals issued an unpublished Memorandum Decision reversing the judgment of the District Court on the ground that petitioner had raised triable issues of fact as to whether he had been fired for speech that is constitutionally protected because his statements raised the

on February 26, 2007. By its express terms, the "Settlement Agreement and Release" (settlement agreement) resolves all existing disputes between Molina and Oxnard, but without the latter admitting any liability to the former.[3]

The settlement agreement contains several provisions that are relevant to the issues raised in this appeal. First, the purpose of the settlement agreement is set forth in its recitations, one of which states: "This Agreement is made as a compromise between Molina and Oxnard for the complete and final settlement of all claims, differences and causes of action with respect to Molina's employment with Oxnard and for every claim for relief, causes of action and/or any events occurring between the parties prior to the execution of the Agreement, including those set forth in the lawsuit entitled Molina v. City of Oxnard, Case No. 00-02291 CAS (SHx) in the United States District Court, Central District of California ('Lawsuit')."

Second, the settlement agreement includes an unconditional waiver and release of all claims by Molina against Oxnard in exchange for the payment to him of $875,000. The settlement agreement, however, does not provide for how such payment, in whole or in part, should be characterized (i.e., as "back pay" or "tort damages"). It says only that the "City [would] prepare a letter that will address the characterization of the settlement amount (hereinafter 'the Letter')." Molina agrees that he will not disseminate the letter other than for preparation of his taxes and to federal or state governmental entities as needed for tax purposes.

Next, section 6 provides for a special "one-day" reinstatement: "6. One Day Reinstatement: Molina is hereby granted an option to be reinstated by the City for one eight hour day for the *sole purpose* of allowing him to be eligible to purchase service credits from the Public Employees' Retirement System. This option shall expire unless exercised within thirty days of the execution of this Agreement, and such day of reinstatement shall occur no later than ninety days from the execution of this Agreement. Plaintiff's duties for the one eight hour day may be assigned by the City at the courtroom of

---

possibility that members of the Oxnard City Council engineered a 'sweetheart deal' with favored contractors at taxpayers' expense." Following remand to the district court, Molina and Oxnard entered into a settlement agreement that, as we discuss below, resolved the action.

[3] Section 4 of the settlement agreement provides: "Neither the execution nor the performance of any term of this Agreement shall constitute or be construed as an admission of any liability to Molina whatsoever by the City. This Agreement is intended solely to end time consuming and costly litigation between the Parties."

Magistrate Carla Woerhle, United States District Court, Central District of California." (Italics added.)[4]

Finally, section 14 provides for the parties' agreement to an integration clause: "14. Entire Agreement. This Agreement is the entire agreement of the Parties pertaining to the subject matter contained in them and supersedes any and all prior and/or contemporaneous negotiations, memoranda of understanding, correspondence, understandings, representations, letters of intent and agreements. The Parties acknowledge and agree that they have not entered into the Agreement in reliance on any inducement, statement, promise or representation other than those contained within the Agreement."

Following the conclusion of the settlement, Molina requested that CalPERS utilize the settlement funds to increase his pension. Molina contended that those funds were characterized as "back pay" and demanded that CalPERS recalculate his pension under two different assumptions: first, by assuming that $200,000 of the settlement proceeds represented his final annual salary with Oxnard and, second, by assuming the entire $875,000 settlement represented his last five years' salary with Oxnard. CalPERS rejected this request, explaining that none of "[t]he payment of $875,000 [can] be reported to CalPERS as *earnable compensation* and [thus it cannot be] properly used in the calculation of your re-retirement allowance to inflate the gross payrate reported by . . . Oxnard." (Italics added.)

Molina appealed this decision and, in the administrative law proceedings that followed, an administrative law judge (ALJ) found that Oxnard's settlement payment[5] constituted neither "payrate" nor "special compensation," and thus none of the settlement proceeds could be used to increase Molina's pension under the applicable law. CalPERS's board adopted the ALJ's decision and denied Molina's administrative appeal.[6]

---

[4] On April 5, 2007, Molina was reinstated by Oxnard for one day pursuant to this provision and he subsequently purchased five years of additional service credits. Pursuant to instructions from CalPERS, Oxnard reported Molina's pay for that day based on his regular salary at the time of his termination ($8,527.98 per month).

[5] During the proceedings before the ALJ, Molina focused on the *entire* $875,000 settlement amount. But, in his petition for a writ of mandate before the trial court, as well as in this appeal before us, he argues that only $200,000 of the settlement proceeds should be taken into account as "back pay" for one year's employment.

[6] In the administrative proceedings initiated after Molina appealed CalPERS's denial of his request to characterize the settlement proceeds as "back pay," the notice of hearing (and the notice of continued hearing) set out by the ALJ listed *both* Molina and Oxnard as "Respondents." Although Molina was at all times represented by counsel, no objection was ever made in the administrative proceedings to either the categorization or participation of Oxnard as a "Respondent."

On June 12, 2009, Molina filed in the trial court a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5)[7] seeking an order directing CalPERS to "set aside its decision and provide Molina a pension consistent with one year's back pay of $200,000."

In support of his petition, Molina asked the trial court to consider not only the administrative record, but also his 2007 federal income tax return, in which he claims to have reported receiving $200,000 in "back pay" and paid income taxes on such amount as required under applicable law. Both CalPERS and Oxnard objected to the receipt in evidence of such tax return arguing that it could have been but was not introduced in the administrative proceedings below. The trial court sustained their objections and ruled that the tax return would not be admitted because Molina was unable to show that the return was either offered and refused as evidence by the ALJ, or was unavailable as evidence at the time of the administrative hearing, as required under Code of Civil Procedure section 1094.5, subdivision (e).

The trial court then considered the merits of Molina's petition, which it denied. First, Molina argued that Oxnard had participated improperly in the proceedings before the ALJ because both Molina and Oxnard were characterized as "respondents," and that, as a result, the burden of proof fell on Oxnard to produce evidence in his support rather than against him. The court found that his contention that he had somehow been prejudiced by the characterization of Oxnard as a respondent was specious, since he and Oxnard "were obviously on opposite sides" and that such designation had no "effect whatsoever on the presentation of evidence or upon the administrative decision." The trial court also rejected the contention that Oxnard was not a necessary party because Molina had never objected to Oxnard's participation before the ALJ and raised the issue for the first time during the writ proceeding.

Next, the trial court dismissed Molina's argument that the ALJ had improperly shifted the burden of proof and of producing evidence to him, explaining: "The administrative decision was based upon the interpretation of the settlement agreement between [Molina] and [Oxnard] and upon various statutes and regulations. Whether the $875,000.00 payment under the settlement agreement constituted compensation was a legal issue and it was rightly decided on the basis of the terms of the integrated settlement agreement."

The trial court then rejected Molina's contention that the settlement agreement granted him the right to unilaterally characterize a portion of the

---

[7] In this petition, Molina named CalPERS and its board of administration as respondents and defendants and Oxnard as respondent and real party in interest.

settlement proceeds as "back pay." The trial court found it "clear from the integrated settlement agreement signed by the parties that any characterization of the settlement amount is [to] be done by . . . Oxnard, not by [Molina]."

Finally, the trial court flatly rejected Molina's contention that relevant case law and the Public Employees' Retirement Law (PERL; Gov. Code, § 20000 et seq.) supported his position that the settlement proceeds were "back pay" and must be taken into account when calculating his pension benefits. As the trial court explained, the Supreme Court opinion on which Molina relied (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483 [66 Cal.Rptr.2d 304, 940 P.2d 891] (*Ventura*)) does not hold that a wrongful termination *settlement* payment "constitutes compensation for the purpose of computing retirement benefits under the state retirement law." Likewise, for the proper application of the PERL section cited by Molina (Gov. Code, § 21198), it is necessary that there be a reinstatement for a *genuine* period of service, not a one-day reinstatement. It cannot be, as it was here, granted for the sole purpose of allowing Molina to purchase service credit and with no services to be performed.

Based on these findings and conclusions, the trial court denied the petition and entered judgment in favor of respondent CalPERS on February 10, 2010. Molina has prosecuted this timely appeal.

## DISCUSSION

### 1. Standard of Review

Code of Civil Procedure section 1094.5 is the administrative mandamus provision providing the procedure for judicial review of adjudicatory decisions rendered by administrative agencies. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–515 [113 Cal.Rptr. 836, 522 P.2d 12].) Code of Civil Procedure section 1094.5 does not specify which cases are subject to independent review, leaving that issue to the courts. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 811 [85 Cal.Rptr.2d 696, 977 P.2d 693].) In cases reviewing decisions which affect a vested, fundamental right, the trial court exercises independent judgment on the evidence. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242].) Retirement benefits of the nature involved here have long been held to be a vested and fundamental right. (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44–45 [112 Cal.Rptr. 805, 520 P.2d 29].) Molina's petition concerned his fundamental, vested right to receive a pension benefit in an amount specified by law. Under applicable law, the trial court was required to exercise its independent judgment in

reviewing the evidence admitted at the administrative hearing to determine whether such evidence supported CalPERS's findings concerning the amount of Molina's pension benefits. (*O'Connor v. State Teachers' Retirement System* (1996) 43 Cal.App.4th 1610, 1620 [51 Cal.Rptr.2d 540].)[8]

We review the trial court's factual findings to determine whether such findings were supported by substantial evidence. (*O'Connor v. State Teachers' Retirement System, supra,* 43 Cal.App.4th at p. 1620; *Prentice v. Board of Administration* (2007) 157 Cal.App.4th 983, 989 [69 Cal.Rptr.3d 167] (*Prentice*).) We must uphold the trial court's findings unless they are " ' "so lacking in evidentiary support as to render them unreasonable." ' " (*Prentice,* at p. 989, quoting *Jaramillo v. State Bd. for Geologists & Geophysicists* (2006) 136 Cal.App.4th 880, 888–889 [39 Cal.Rptr.3d 170].) We may not reweigh the evidence, but instead are bound to consider the facts in the light most favorable to CalPERS's board, giving it every reasonable inference and resolving all conflicts in its favor. (*Prentice,* at p. 989, citing *Jaramillo,* at pp. 888–889.)

A different standard, however, applies to questions of law. We review trial court decisions as to those questions de novo. (*Prentice, supra,* 157 Cal.App.4th at p. 989.) "However, where our review requires that we interpret the PERL or a PERS regulation, the court accords great weight to PERS interpretation. [Citation.]" (*Ibid.*)

### 2. *The Integrated Settlement Agreement Did Not Grant to Molina Any Right to Characterize the Settlement Proceeds*

As a preliminary matter, we agree with the trial court's conclusion that the settlement agreement was integrated. Molina argues that the settlement agreement was not integrated and that both the ALJ and the trial court should have considered extrinsic evidence on the issues of (1) the proper characterization of the settlement proceeds, and (2) which of the parties had the right to designate such characterization.[9] He argues in his opening brief that his

---

[8] The trial court did conduct such an independent review. As it noted in its order of January 22, 2010, "[this] court has independently examined the administrative record, and finds that the weight of the evidence produced at the administrative hearing supports the administrative decision, however there are really no facts in dispute in the matter, and the issues presented to the court are solely issues of law concerning the interpretation of the written settlement agreement between petitioner and the City of Oxnard and the meaning of certain statutes and regulations."

[9] Molina also argues that the trial court erred in not finding that he was prejudiced by the fact that, for the administrative hearing, Oxnard was named a respondent along with him and thus had the "burden of proof to come forward with evidence to support Molina; [but] instead Oxnard opposed Molina and impeded the introduction of essential evidence . . . ." He cites Government Code section 11500, which defines "respondent," as authority supporting his

right to characterize the settlement proceeds was made a "condition of settlement" and that Oxnard had "agreed to allow Molina to characterize the settlement proceeds." Molina argues further that he and Oxnard had an "understanding" about how the settlement proceeds meet the PERL standards for increasing Molina's pension and that this understanding is "[e]xplicit in the language of the Settlement Agreement." He goes on to state that "[i]mplicit in that understanding is that Molina had the right to characterize whether the proceeds were salary or tort damages." This argument is without merit because it is not supported by the record. Not only did Molina fail to provide any evidence before the ALJ to support these contentions, they are inconsistent with the law on integrated agreements.

■ " 'An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.' . . . In California, the rule is embodied in Code of Civil Procedure section 1856, which states that '[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.' " (*Alling v. Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1433 [7 Cal.Rptr.2d 718], citation omitted.)

Such an integration was clearly the intent of the parties here. The settlement agreement (in § 14) clearly states that it "is the entire agreement of the Parties pertaining to the subject matter contained in them and supersedes any and all prior and/or contemporaneous negotiations, memoranda of understanding, correspondence, understandings, representations, letters of intent and agreements. The Parties acknowledge and agree that they have not entered into the Agreement in reliance on any inducement, statement, promise or representation other than those contained within the Agreement."

In discussing Molina's main contention, the trial court directly addressed this issue. After reciting Molina's contention that, "as a condition of settlement," he had received the right to characterize the settlement proceeds "as

argument and cites various cases regarding the burden of proof in administrative hearings. None of the cases he refers to supports his argument and we find it is entirely without merit. As the trial court stated below, "[t]he employer and the employee were obviously on opposite sides in the dispute and [Molina] points to no evidence that indicates that their common designation as respondents had any effect whatsoever on the presentation of evidence or upon the administrative decision." We agree with the trial court. Molina has the burden of affirmatively demonstrating prejudicial error and he failed to do so. (Code Civ. Proc., § 475; *Kyne v. Eustice* (1963) 215 Cal.App.2d 627, 635 [30 Cal.Rptr. 391].) Moreover, Molina was aware that Oxnard was named respondent and failed to object to Oxnard's participation in any capacity at any point during the administrative hearing and thus he cannot raise any objection to it now. (*Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 208–209 [99 Cal.Rptr.2d 357].)

back pay or compensation," the trial court noted that Molina's authority for such a statement was the settlement agreement itself. The trial court then stated the settlement agreement "plainly does NOT give any right to petitioner to characterize the settlement payment, or any part thereof, as back pay or compensation. [¶] The settlement agreement provides in pertinent part, 'a check in the amount of $875,000 . . . shall be delivered to the undersigned counsel for Molina. . . . [Oxnard] will also prepare a letter that will address the characterization of the settlement amount. . . . Molina agrees that he will not disseminate the letter other than for the preparation of his taxes and to federal or state governmental entities as needed for tax purposes.' It is clear from the integrated settlement agreement signed by the parties that any characterization of the settlement amount is [to] be done by . . . Oxnard, not by petitioner."

The settlement agreement contained a clause which provided that Oxnard, *after the agreement was executed,* would "address the characterization of the settlement amount" in a letter that could be used only for preparation of Molina's taxes and related tax purposes and that could not otherwise be disseminated. This plain language gave Oxnard authority to "address the characterization of the settlement amount" in that letter and for that specific and limited purpose; i.e., that purpose being the preparation of Molina's taxes. It clearly did not give Oxnard the authority to characterize the settlement payment for purposes of determining Molina's pension, nor did it give Molina that authority.

We do not agree with Molina that the fact that the settlement agreement is otherwise silent on the issue of characterization provides any justification for an inference by this court that he is entitled to make such a characterization for purposes of increasing his retirement pension. We also reject Molina's contention that (1) a letter from CalPERS dated June 19, 2006 (relating to the amount that should be reported to CalPERS should Oxnard reinstate him for a five-month period after his termination and the commencement of his employment by LACOE—an event that did not occur), or (2) his complaint against Oxnard in the federal action[10] should be considered on the issue of the meaning to be given to the language of the settlement agreement. All such extraneous evidence is necessarily precluded by the integration clause in the settlement agreement.[11]

---

[10] The complaint in the federal action was received in evidence by the ALJ in the administrative proceedings *for foundational purposes only.* It was expressly not received or to be considered for the truth of its allegations concerning the nature of Molina's wrongful termination claims.

[11] Molina argues that the trial court erred in not admitting his 2007 tax return into evidence. In general, we review a trial court's ruling on the admissibility of evidence for an abuse of discretion. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111 [88

Moreover, both Molina and Oxnard were well aware, prior to execution of the settlement agreement, that any characterization of the settlement proceeds would not be relevant to any determination as to the proper amount of Molina's CalPERS pension. For example, CalPERS had advised both Molina and Oxnard on November 28 and again on November 30, 2006, that a portion of the settlement payment could potentially be eligible for inclusion in Molina's pension, *but only if Molina were reinstated for a full year in a valid position under a legitimate salary based on a salary schedule.* But this did not happen. Rather, he was reinstated for only one day, the purpose of which was solely to purchase service credits which otherwise would not have been available, a right for which he had apparently bargained and was granted by Oxnard in the settlement agreement.

None of the authorities cited by Molina helps him avoid the impact and effect of the rules regarding integrated agreements. We simply cannot read into the settlement agreement a provision which the parties plainly did not intend to include. More importantly, to do so would contravene the clear statutory provisions in PERL. We now turn to that issue.[12]

3. *Molina's Pension Can Only Be Determined by the Provisions of PERL*

■ "In *City of Sacramento v. Public Employees Retirement System* [(1991)] 229 Cal.App.3d [1470,] 1478–1479 [280 Cal.Rptr. 847], the court summarized the general principles governing determination of a public employee's retirement allowance: 'Under the PERL, the determination of what benefits and items of pay constitute "compensation" is crucial to the computation of an employee's ultimate pension benefits. The pension is calculated to equal a certain fraction of the employee's "final compensation" which is multiplied by a fraction based on age and length of service. [Citations.] "Final compensation" is the "highest average annual *compensation earnable* by a member during the three consecutive years of employment

---

Cal.Rptr.3d 778].) The trial court found that Molina did not satisfy the requirements of Code of Civil Procedure section 1094.5, subdivision (e), because he failed to show that "he either offered the tax return in evidence at the administrative hearing and it was refused, or that the income tax return was not available at the time of that hearing." Molina points to no evidence in the record that he satisfied either one of these requirements.

[12] Molina also argues that the trial court should have "shifted the burden" to CalPERS and Oxnard to prove that the entire settlement amount he received was *not* back pay for purposes of calculating his pension benefits. As we explain, whether the settlement funds are so characterized does not necessarily impact the calculation of Molina's pension benefits. Further, Molina cites no authority and we have found none that supports this argument.

immediately preceding the effective date of his retirement" or other designated consecutive three-year period. [Citation.] Both the employer and the employee are required to make contributions to the system, based on a percentage of "compensation." ' " (*Prentice, supra*, 157 Cal.App.4th at p. 989.)

In a case very similar to the one before us, the court in *Prentice, supra*, 157 Cal.App.4th at page 983 discussed the PERL provisions that determine the amount of a public employee's pension. The plaintiff in that case, Glenn Prentice, was general manager of a city that had contracted with CalPERS. Right before retirement, the city gave him a pay increase, which he asked CalPERS to include in his pension calculation. CalPERS refused, and Prentice petitioned for a writ of mandate. The trial court denied the petition, and on appeal, the *Prentice* court affirmed. It explained that the amount of a pension is most directly a function of two variables: (1) an age-adjusted fraction of the employee's "final compensation" and (2) the employee's service credit. (*Prentice*, at p. 989, citing *City of Sacramento v. Public Employees Retirement System, supra*, 229 Cal.App.3d at pp. 1478–1479; see also, e.g., Gov. Code, § 21354.3.)

The *Prentice* court described the derivation of "final compensation": (1) It is a function of the employee's highest "compensation earnable" (*Prentice, supra*, 157 Cal.App.4th at p. 989);[13] (2) "Compensation earnable" consists of a member's "payrate" and "special compensation" (157 Cal.App.4th at pp. 989–990, citing Gov. Code, § 20636, subd. (a)); (3) An employee's "payrate" is the monthly amount of cash compensation received by the employee " 'pursuant to publicly available pay schedules.' " (157 Cal.App.4th at p. 990, quoting Gov. Code, § 20636, subd. (b)(1).)[14] This means that an employee's pension will not necessarily reflect his total personal compensation because payrate, like special compensation, is "measured by the amounts provided by the employer *to similarly situated employees*" (157 Cal.App.4th at p. 992, italics added); and (4) "Special compensation" is, generally, a " 'payment received for special skills, knowledge, abilities, work

---

[13] For an employee working for a contracting agency like Oxnard, "final compensation" means his or her "highest average annual compensation earnable" over either a one-year or a three-year service period. (Gov. Code, §§ 20037, 20042.)

[14] Government Code section 20636, subdivision (b)(1) reads: " 'Payrate' means the normal monthly rate of pay or base pay of the member paid in cash to similarly situated members of the same group or class of employment for services rendered on a full-time basis during normal working hours, pursuant to publicly available pay schedules. 'Payrate,' for a member who is not in a group or class, means the monthly rate of pay or base pay of the member, paid in cash and pursuant to publicly available pay schedules, for services rendered on a full-time basis during normal working hours, subject to the limitations of paragraph (2) of subdivision (e)."

assignment, workdays or hours, or other work conditions,' " but is " 'limited to that which is received by a member pursuant to a labor policy or agreement or as otherwise required by state or federal law, to similarly situated members of a group or class of employment that is in addition to payrate.' " (*Id.*, at p. 990, italics omitted, quoting Gov. Code, § 20636, subd. (c).)[15]

To summarize, a participant's specific pension benefit depends on "final compensation," which will not increase without a rise in "payrate" or "special compensation." In *Prentice*, the court held: "The increase Prentice received was neither part of his payrate nor special compensation. Accordingly, it was not part of his final compensation." (*Prentice, supra*, 157 Cal.App.4th at p. 996.) The court found that Prentice's pay increase was not part of his "payrate" because it was never part of a published pay schedule. (*Id.*, at pp. 993–994.) And, the increase could not be considered "special compensation" because it was not "set forth 'in a written labor policy or agreement' and 'available to all members in the group or class.' " (*Id.*, at p. 995.)

Molina's argument appears to confuse the total pay he might receive that could be includible in gross income for tax purposes and the published rate at which he was paid. Thus, even if the $200,000 figure (now settled upon by Molina) was deemed "back pay," this would not necessarily increase his pension because the payrate for the position he had held with Oxnard was $8,527.98 per month and it was not affected by the settlement payout. As one of CalPERS's witnesses explained in the administrative proceedings, back pay could hypothetically affect a pension, but in order for Molina to have a qualifying "$200,000 final compensation, he would have had to have been reinstated into a . . . position with the City of Oxnard whose publicly available pay scale is $200,000. And he would have had to have worked in that position for 12 months. And that would entitle him to a re-retirement with the final compensation of $200,000."

Molina, however, was not reinstated by Oxnard for a year at a published monthly payrate that would have generated $200,000 in yearly compensation. Rather, he was reinstated for a single day at his *normal* monthly rate.

---

[15] Government Code section 20636, subdivision (c) makes plain that, like "payrate," "special compensation" is not determined by whatever amount an employee happens to be paid. Section 20636, subdivision (c)(2), reads: "Special compensation shall be limited to that which is received by a member pursuant to a labor policy or agreement or as otherwise required by state or federal law, to similarly situated members of a group or class of employment that is in addition to payrate. If an individual is not part of a group or class, special compensation shall be limited to that which the board determines is received by similarly situated members in the closest related group or class that is in addition to payrate . . . ."

Thus, there was no legal basis for his assertion that $200,000 of the settlement payment should increase Molina's pension benefits.

As noted earlier, and like the plaintiff in *Prentice*, Molina fails to recognize the important difference between the amount he was paid by Oxnard (i.e., the settlement proceeds), which may be subject to income taxes, and the much narrower category of "compensation earnable" that can be taken into account for pension purposes, as established under PERL. Because, under PERL, even if a portion of the settlement amount had been labeled back pay and was includible in taxable income, it could not be included in Molina's "payrate" because there was no evidence that the amount was either (1) paid to similarly situated employees or (2) paid in accordance with a "publicly available pay schedule[] . . . for services rendered on a full-time basis during normal working hours." (Gov. Code, § 20636, subd. (b)(1).) Similarly, even if a portion had been labeled back pay, no part of the settlement qualifies as being "special compensation," because Molina failed to show that it either (1) was available to similarly situated employees under a labor policy or federal requirement or (2) was determined by the CalPERS board to have been available to other, similarly situated employees as required by PERL. (See Gov. Code, § 20636, subd. (c)(2); see also Cal. Code Regs., tit. 2, § 571, subd. (b) ["all items of special compensation" must meet certain board-specified requirements, including that they be "[c]ontained in a written labor policy or agreement"; "[a]vailable to all members in the group or class"; and "[h]istorically consistent with prior payments for the job classification"].)

These statutory retirement provisions make it clear that the settlement proceeds cannot, as a matter of law, be utilized to increase Molina's final compensation for purposes of calculating his pension benefits. Neither of the sections of the Government Code on which Molina relies provides a basis for his arguments.[16] Nor does the Supreme Court's decision in *Ventura, supra*, 16 Cal.4th 483. That case addressed the calculation of pension benefits of county deputy sheriffs who had received certain special cash payments above the basic salary paid to other deputies. (*Id.*, at pp. 488–489.) The *Ventura* court

---

[16] Government Code section 21198 does not support Molina's contentions. Section 21198 merely recognizes that pursuant to judicial proceedings, an employee who is involuntarily terminated from his or her employment may be reinstated and, as a result, CalPERS may be required to provide *service credit* for the period of reinstatement.

Nor does Government Code section 20636, subdivision (a) help Molina despite his argument to the contrary. He argues that back pay is explicitly included in "payrate" and "special compensation" as those terms are used in section 20636, subdivision (a), but that section states only that: " 'Compensation earnable' by a member means the payrate and special compensation of the member, as defined by subdivisions (b), (c), and (g), and as limited by Section 21752.5."

held that, under the law relating to county employee pensions, cash payments for educational incentives, motorcycle or pilot duty, uniform maintenance, and similar items should be considered "compensation earnable" by each individual deputy to whom they were paid. (*Id.*, at pp. 487–489.)

■ *Ventura* makes it plainly clear that an individual's pay will not count towards "compensation earnable" unless it qualifies as either "payrate" or "special compensation." Additionally, *Ventura* describes certain specific types of cash payments, as noted above, that count towards "compensation earnable" precisely because they do meet PERL's definition of "special compensation." But *Ventura* says nothing that would require broadening PERL's definition of "compensation earnable" to include cash payments that are *not* special compensation.[17]

As CalPERS, in its respondent's brief, correctly points out: "Whether or not back pay might be considered 'compensation' is academic. It is 'compensation earnable'—not 'compensation'—that is used to set the amount of the pension; and 'compensation earnable' is a narrow subset of 'compensation.' (See *Ventura, supra,* 16 Cal.4th at pp. 493–494 ['an item must meet [the] broad definition of "compensation" if it is also to fall within the narrower category of "compensation earnable" . . . and thus form the basis for the calculation of 'final compensation' on which the pension is based . . . .']) [¶] . . . *Ventura* says nothing to support Molina's insistence that the settlement proceeds constitute any kind of compensation used for the purpose of computing his CalPERS retirement benefits."

■ As we find that none of the settlement proceeds constitutes any kind of compensation used for the purpose of computing his CalPERS retirement benefits, we need not reach or address Molina's contention that Oxnard has a duty to report the settlement sum to CalPERS.[18]

---

[17] The trial court made the same point in rejecting this argument by Molina and discussing the language utilized by the *Ventura* court: "The [*Ventura*] case contains no such holding. The [*Ventura*] court holds that, 'bilingual premium pay, a unified maintenance allowance, education incentive pay, additional compensation for scheduled meal periods for designated employees, pay in lieu of annual leave accrual, holiday pay, a motorcycle bonus, and a field training officer bonus' constitute compensation under the pension law governing county employees, Government Code section 31450 et seq. There is nothing in the decision of the Supreme Court that holds that the proceeds of a settlement of an action for damages for wrongful termination of employment in violation of the employee's rights of free speech, constitutes compensation for the purpose of computing retirement benefits under the state retirement law." The trial court's analysis is correct.

[18] To the extent Molina asserts additional arguments not specifically addressed herein, we find such arguments entirely lacking in merit.

## *DISPOSITION*

The judgment is affirmed. CalPERS and Oxnard shall recover their costs on appeal.

Klein, P. J., and Kitching, J., concurred.