[No. D049252. Fourth Dist., Div. One. Dec. 7, 2007.]

GLENN E. PRENTICE, Plaintiff and Appellant, v.
BOARD OF ADMINISTRATION, CALIFORNIA PUBLIC EMPLOYEES'
RETIREMENT SYSTEM, Defendant and Respondent.

## COUNSEL

Law Office of Michael A. Conger and Michael A. Conger for Plaintiff and Appellant.

Peter H. Mixon and Wesley E. Kennedy for Defendant and Respondent.

## OPINION

**BENKE, J.**—The Legislature and the Board of Administration of the California Public Employees' Retirement System (PERS) have adopted limitations on the salary which may be considered in calculating a public employee's retirement allowance. Among other matters, these limitations exclude from consideration payments which were not available to similarly situated public employees. In this case a local municipality decided to provide the manager of its water and power department with a 10.49 percent salary increase during what turned out to be the last two years of his career. Although the municipality had a salary range for the manager's position which would have applied to anyone else who filled the position, the municipality did not alter the salary range to reflect the increase and it was not otherwise available to other employees in the same class as the manager. In light of these circumstances, PERS did not include the salary increase in calculating the manager's retirement allowance. The manager then challenged PERS's decision by way of a petition for a writ of mandate, which the trial court denied.

On appeal, we affirm. The salary increase was outside the limits of compensation which may be used in calculating a public employee's retirement allowance. Because it was not reflected in the city's published salary range, it was not part of the manager's regular payrate. Moreover, because the increase was not available to other managers, it could not be included in the retirement calculation as "special compensation."

## FACTUAL AND PROCEDURAL BACKGROUND

During his 33-year employment career, plaintiff and appellant Glenn E. Prentice worked in various capacities for a number of water and sewer agencies in Southern California. In his last two jobs he was the director of water utilities for the City of Corona and then the general manager of the City of Corona's department of water and power.

The City of Corona created its department of water and power in 2001 in order to develop its own energy delivery system and asked Prentice to become its general manager. At the time the city gave Prentice this new responsibility, it also gave him a 10.49 percent pay raise.

The City of Corona recognized that Prentice's raise violated provisions of the public employees retirement law (PERL) that exclude from calculation of retirement allowances salary increases that exceed the average increase provided to all employees in the same employment classification. (See Gov. Code,[1] § 20636, subd. (e).) Accordingly, in November 2001 an assistant city manager for the City of Corona requested an exemption from those provisions. In response to the request for an exemption, a PERS compensation review analyst asked the assistant manager whether Prentice's successor would receive the same level of compensation. The assistant city manager stated: "Perhaps. It is unknown at this point whether the City would retain this compensation structure or hire a separate Electric Utility Director to lead the operations once it is up and running." In light of this response and other information provided by the city, the PERS compensation review analyst denied the City of Corona's request for an exemption. The analyst found that Prentice's additional pay did not qualify under any of the exceptions provided by applicable statutes and regulations.

Notwithstanding the fact PERS had denied its request for an exemption, the City of Corona paid Prentice the additional salary. Prentice retired from service with the city as of December 30, 2003. After Prentice retired, the city

---

[1] All further statutory references are to the Government Code unless otherwise specified.

stopped paying the general manager of the water and power department the 10.49 percent increase Prentice had received.[2]

Following his retirement, Prentice applied to PERS for a retirement allowance. In applying for a retirement allowance, Prentice claimed his final compensation included the pay raise he received at the time he became manager of the water and power department. After reviewing Prentice's final compensation claim, PERS determined his final compensation did not include the raise.

Prentice filed an administrative appeal of PERS's determination of his final compensation. After a hearing, an administrative law judge issued a proposed decision denying Prentice's appeal. The administrative law judge found the increase was neither included in Prentice's normal payrate nor special compensation. The proposed decision was adopted by the PERS Board of Administration. Prentice sought review of the PERS decision by way of a writ of mandate filed in the trial court. After briefing by the parties, the court denied the petition. Prentice filed a timely notice of appeal.

## DISCUSSION

### I

Where, as here, an administrative decision " 'substantially affects a *fundamental vested right*, the trial court, in determining under [Code of Civil Procedure] section 1094.5 whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its *independent judgment* on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence.' [Citations.]

"If the administrative decision does not substantially affect a fundamental vested right, the trial court considers only whether the findings are supported by substantial evidence in the light of the whole record. [Citation.] [¶] . . . [¶]

---

[2] In a letter Prentice's counsel sent to PERS following Prentice's retirement, counsel stated: "[T]he position of General Manager, Department of Water and Power, did not exist in its present form when [Prentice] performed work beginning in July 2002. At that time, the City of Corona operated a water utility and was in the process of establishing its own electric utility. There was no separate General Manager position for the electric utility, as that department had not yet been created and there was no guarantee that the City's efforts to establish the electric utility would be successful. The $14,225.25 monthly salary he received included compensation for his expanded duties in creating the electric utility and ensuring that the utility was a viable operation. Since the electric utility is presently established, there is no longer a reason to compensate the General Manager of that department for *creating* the electric utility. The City has since established a modified version of the General Manager's position in the Department of Water and Power for which, as Mr. Johnson points out, the city has budgeted $12,875 per month for the 2003–2004 fiscal year."

"On appeal, whichever standard was used below, the standard for review of the trial court's factual determinations is whether they are supported by substantial evidence. [Citations.] '[A]n appellate court must uphold administrative findings unless the findings are so lacking in evidentiary support as to render them unreasonable. [Citations.] A reviewing court will not uphold a finding based on evidence which is inherently improbable [citation], or a finding based upon evidence which is irrelevant to the issues. [Citations.]' [Citation.] The reviewing court, like the trial court, may not reweigh the evidence, and is 'bound to consider the facts in the light most favorable to the Board, giving it every reasonable inference and resolving all conflicts in its favor. [Citations.]' [Citation.]" (*Jaramillo v. State Bd. for Geologists & Geophysicists* (2006) 136 Cal.App.4th 880, 888–889 [39 Cal.Rptr.3d 170].)

We of course review questions of law de novo. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888–889 [264 Cal.Rptr. 139, 782 P.2d 278].) However, where our review requires that we interpret the PERL or a PERS regulation, the court accords great weight to PERS interpretation. (*City of Sacramento v. Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1478 [280 Cal.Rptr. 847].)

II

In *City of Sacramento v. Public Employees Retirement System, supra,* 229 Cal.App.3d at pages 1478–1479, the court summarized the general principles governing determination of a public employee's retirement allowance: "Under the PERL, the determination of what benefits and items of pay constitute 'compensation' is crucial to the computation of an employee's ultimate pension benefits. The pension is calculated to equal a certain fraction of the employee's 'final compensation' which is multiplied by a fraction based on age and length of service. [Citations.] 'Final compensation' is the 'highest average annual *compensation earnable* by a member during the three consecutive years of employment immediately preceding the effective date of his retirement' or other designated consecutive three-year period. [Citation.] Both the employer and the employee are required to make contributions to the system, based on a percentage of 'compensation.' " (Italics added, fns. omitted.)[3]

Section 20636, subdivision (a), provides: " 'Compensation earnable' by a member means the payrate and special compensation of the member, as defined by subdivisions (b), (c), and (g), and as limited by section 21752.5."

---

[3] The court in *City of Sacramento v. Public Employees Retirement System* discussed a prior version of PERL, which was amended and sections renumbered, without substantive change, in 1996. (Stats. 1996, ch. 906, § 203, p. 5100.)

Under section 20636, subdivision (b)(1): " 'Payrate' means the normal monthly rate of pay or base pay of the member paid in cash to similarly situated members of the same group or class of employment for services rendered on a full-time basis during normal working hours, pursuant to publicly available pay schedules. 'Payrate,' for a member who is not in a group or class, means the monthly rate of pay or base pay of the member, paid in cash and pursuant to publicly available pay schedules, for services rendered on a full-time basis during normal working hours, subject to the limitations of paragraph (2) of subdivision (e)."[4]

Under section 20636, subdivision (c): "(1) Special compensation of a member includes a payment received for special skills, knowledge, abilities, work assignment, workdays or hours, or other work conditions.

"(2) *Special compensation shall be limited to that which is received by a member pursuant to a labor policy or agreement or as otherwise required by state or federal law, to similarly situated members of a group or class of employment that is in addition to payrate.* If an individual is not part of a group or class, special compensation shall be limited to that which the board determines is received by similarly situated members in the closest related group or class that is in addition to payrate, subject to the limitations of paragraph (2) of subdivision (e)." (Italics added.)

Section 20636, subdivision (e), in turn provides: "(1) As used in this part, 'group or class of employment' means a number of employees considered together because they share similarities in job duties, work location, collective bargaining unit, or other logical work related grouping. One employee may not be considered a group or class.

"(2) Increases in compensation earnable granted to an employee who is not in a group or class shall be limited during the final compensation period applicable to the employees, as well as the two years immediately preceding the final compensation period, to the average increase in compensation earnable during the same period reported by the employer for all employees who are in the same membership classification, except as may otherwise be determined pursuant to regulations adopted by the board that establish reasonable standards for granting exceptions."

---

[4] The reference to "publicly available pay schedules" in section 20636, subdivision (b)(1), was added by the Legislature following the trial court's judgment. (Stats. 2006, ch. 118, § 4.) We have taken judicial notice of the legislative history concerning this change and the history confirms that the change was a matter of clarification. (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 2244 (2005–2006 Reg. Sess.) May 18, 2006, p. 2.) Thus, this appeal is governed by the current version of the statute. (See *Kuykendall v. State Bd. of Equalization* (1994) 22 Cal.App.4th 1194, 1206–1207 [27 Cal.Rptr.2d 783].)

■ By regulation, PERS also further defined the "special compensation" which may be considered in calculating a member's retirement benefits. In particular, California Code of Regulations, title 2, section 571, subdivision (a)(3), provides that "special compensation" includes "premium pay," which the regulations define as "[c]ompensation to employees who are required by their employer or governing board or body to work in an upgraded position/classification of limited duration." However such an item of compensation is reportable as "special compensation" only if it is contained "in a written labor policy or agreement" and "[a]vailable to all members in the group or class." (Cal. Code Regs., tit. 2, § 571, subd. (b)(1), (2).)

■ By way of regulations, the PERS Board of Administration permits employers to request an exception to the "average increase" requirements of former section 20023, subdivision (e), now section 20636, subdivision (e). California Code of Regulations, title 2, section 572, provides that PERS's decision to grant or deny such a request "will be based on a comparison between increased compensation earnable, as reported for the employee during his or her period of final compensation and compensation earnable reported for the group or class of employees in his or her same membership classification. [¶] PERS will review the full history of payroll reporting for the employee, and all relevant payroll reporting for the membership classification, as to both payrate and special compensation. In no case will an exception be granted if PERS determines that the comparative increase in compensation earnable by the employee fails to conform with the following standards set forth in subsections (a) and (b) below as well as other applicable provisions of the law.

"(a) If reported in payrate, the increased compensation must be:

"(1) Contained in a written labor agreement;

"(2) Part of normally-required duties;

"(3) Performed during normal hours of employment;

"(4) Paid periodically as earned;

"(5) *Historically consistent with prior payments for the membership classification; and*

"(6) Not final settlement pay.

"(b) If reported in special compensation, the increased compensation must be:

"(1) Contained in a written labor agreement;

"(2) Part of normally-required duties;

"(3) Performed during normal hours of employment;

"(4) Paid periodically as earned;

"(5) *Historically consistent with prior payments for the membership classification;*

"(6) Listed as special compensation in Section 571; and

"(7) Not final settlement pay." (Italics added.)

Importantly, the Legislature has expressly excluded overtime pay from computation of a member's payrate or special compensation. (§ 20635; *Santa Monica Police Officers Assn. v. Board of Administration* (1977) 69 Cal.App.3d 96, 100, 101 [137 Cal.Rptr. 771].) In doing so the Legislature has specifically considered instances where an employee is asked to take on additional duties and found that such additional duties are to be treated as excluded overtime. (§ 20635.)

In sum, "[c]alculation of 'compensation earnable' is not based on individual efforts . . . ." (*City of Sacramento v. Public Employees Retirement System, supra,* 229 Cal.App.3d at p. 1479.) Rather, both components of "compensation earnable," an employee's payrate and special compensation, are measured by the amounts provided by the employer to similarly situated employees. (See § 20636, subds. (b)(1), (2), (c), (e)(2).)

### III

Because Prentice's "compensation earnable" is in important respects limited to the compensation provided to similarly situated employees, we must first determine the employee class or group to which Prentice belonged or his member classification. (See § 20636, subds. (b)(1), (2), (c), (e)(2).)

PERS argues, and the trial court found, Prentice was a member of the management confidential class of city employees that, as of November 2003, included 42 managers and assistant managers of other city departments. As PERS points out, this finding is fully supported by documentary evidence supplied by the city. When, in November 2001, the city initially asked PERS for an exception to the requirements of former section 20023, subdivision (e), now section 20636, subdivision (e), the city advised PERS that Prentice was

a member of the management confidential group. In particular, in responding to a specific question PERS had posed, the city stated: "**Comparison with others in Class**: Employees in this class typically receive a 5% annual merit increase." In 2004 the city informed PERS that following the 10.49 percent step increase Prentice received when the electric utility was established, Prentice received a further step raise "granted to all members of the Management Confidential group as cost of living increase." These statements by the city are persuasive as to Prentice's classification because they show Prentice was eligible for and received the compensation increases awarded to other members of the management confidential group.

■ On appeal, Prentice argues that in addition to being a member of the management confidential group, he was also a member of a group made up of himself and the city manager. Contrary to Prentice's suggestion, we do not believe that for purposes of applying the limitations on compensation earnable set forth in the PERL an employee may be a member of more than one group or classification. We note that in both the PERL and the applicable regulations, references to class, group or classification are, for the most part, preceded by the definite article "the," rather than the indefinite "a." This word choice strongly implies the existence of a single classification rather than alternative classifications. More importantly, the alternative classification scheme Prentice asserts would be inconsistent with what we perceive as the central role of the limitations on compensation earnable, to wit: preventing local agencies from artificially increasing a preferred employee's retirement benefits by providing the employee with compensation increases which are not available to other similarly situated employees. An alternative classification scheme would plainly give local agencies a level of flexibility inconsistent with the purpose of the limitations.

IV

Prentice's increase was not part of his "payrate" within the meaning of section 20636, subdivision (b)(1). Contrary to Prentice's contention on appeal, his increased pay was never made part of a publicly available pay schedule, as required by the statute. As we have noted, at the time the city applied to PERS for an exception, the city told PERS that it had not decided whether Prentice's successor would receive the increase. Thereafter the pay range for the management confidential group, although it listed Prentice's position and pay, did not include the increase. Indeed, an e-mail sent by a city employee shortly before Prentice's retirement states: "[Prentice] has applied to PERS for some type of benefit and so PERS requested a copy of his salary range. However [Prentice] is being paid at a step that's higher than the range

listed for General Manager-DWP. He is paid at step 634, but the top step for a General Manager-DWP is listed as step 614." Significantly, a year later in response to a question from Prentice, the city manager stated: "You have asked what the City's policy is regarding employee salary information being accessible to the public. [¶] . . . [¶] If such a request had been received from a member of the public between June 30, 2001 and June 29, 2002 for your former position, the City's response would have been: 'The salary range for this position is $10,134 to $12,371 per month. However, the individual who currently holds this position has a salary of $13,669 per month.' " The city manager went on to state that for the remaining period of Prentice's service, any inquiry would have been met with a similar response, i.e., the salary range for the position did not include the actual salary being paid to the current holder of the position.

This record fully supports PERS's determination the increase Prentice received was never part of a published pay schedule within the meaning of section 20636, subdivision (b)(1). This record shows the city consistently excluded the increase from the salary range available for Prentice's position.

Admittedly, as Prentice points out, his full salary would have been available to anyone examining the city's annual budget. However, as a practical matter, inclusion of a provisional or temporary salary in a budget document would not have afforded any other person holding the position the right to receive the same increase, where, as here, the city itself consistently recognized that the salary range did not include the raise. Because, as we view the entire statutory scheme, the limitations on salary are designed to require that retirement benefits be based on the salary paid to similarly situated employees, PERS acted properly in looking at the published salary range rather than the exceptional arrangement the city made with Prentice and reflected in the city's budget documents. The defect in Prentice's broad interpretation of "pay schedule" is that it would permit an agency to provide additional compensation to a particular individual without making the compensation available to other similarly situated employees.

V

In light of the fact that Prentice was a member of the management confidential group, the increase he received was not special compensation. Although the record suggests that at the time Prentice received his increase

the payrate of three other members of the management confidential group were also increased by 10.49 percent,[5] the increases the other employees received do not meet the requirements of California Code of Regulations, title 2, section 571, subdivision (b)(1) and (2). As we have noted under the regulations, to be considered premium pay and hence "special compensation," the increased pay must be set forth "in a written labor policy or agreement" and "available to all members in the group or class." (Cal. Code Regs., tit. 2, § 571, subd. (b)(1), (2); see also Cal. Code Regs., tit. 2, § 571, subd. (d) ["If an item of special compensation . . . . is out of compliance with any of the standards in subsection (b) as reported for an individual, then it shall not be used to calculate final compensation for that individual"].) The increase Prentice received was neither the subject of a written labor policy or agreement nor available to all members of the management confidential group.

■   Contrary to Prentice's contention on appeal, the fact his raise was the subject of a written memorandum from the city manager to the human resources department did not satisfy the requirement that it be set forth in a written labor policy or agreement. A written *employment* agreement with an individual employee is not a *labor* policy or agreement within the meaning of the regulation. As used in the regulation, the term "labor" modifies both "policy or agreement," and implicitly restricts the referenced policies or agreements to either policies which cover a whole class of employees or collective bargaining agreements. This restricted and more literal reading of the regulation is required because the broad interpretation offered by Prentice would essentially provide no limit on the compensation a local agency could provide to individual employees by way of individual agreements.

More importantly, even if we treated the memorandum as a "labor policy" or "labor agreement" within the meaning of the regulation, the increase Prentice received would still fail to meet the requirements of the regulation. The record is undisputed the increase was not available to all other members of the Management Confidential group as required by California Code of Regulations, title 2, section 571, subdivision (b)(2), or in any sense historically consistent with prior payments to members of the group within the meaning of California Code of Regulations, title 2, section 572, subdivisions (a)(5) and (b)(5).[6]

---

[5] The other three employees were Prentice's subordinates in the new department of water and power. Unlike Prentice's salary increase, their pay increases were reflected in the published pay range for their new positions in the department of water and power.

We have taken judicial notice of PERS's own decision in *Ramirez v. City of Indio* (Dec. 20, 2000, No. 2640) PERB Precedential Decision No. 00-06, in which PERS rejected the contention that the increased salary a police chief received while temporarily acting as a city manager was special compensation.

## CONCLUSION

■ The increase Prentice received was neither part of his payrate nor special compensation. Accordingly, it was not part of his final compensation.

Judgment affirmed.

McConnell, P. J., and Aaron, J., concurred.