Filed 7/31/13  Kirpalani v. Bd. of Admin., CalPERS CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| KRISHNA KIRPALANI,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BOARD OF ADMINISTRATION,<br>CALIFORNIA PUBLIC EMPLOYEES'<br>RETIREMENT SYSTEM,<br><br>        Defendant and Appellant. | A135288<br><br>(Alameda County<br>Super. Ct. No. RG11565879) |

Respondent Krishna Kirpalani was a longtime employee of the Redwood City Elementary School District (district).  In 2005, she agreed to retire in return for a salary in the final year of her employment that was substantially higher than the district's published salary for her position.  Although she anticipated her retirement benefits from the California Public Employees' Retirement System (PERS) would be based on her full salary, PERS's staff disagreed, insisting her pensionable compensation was limited to the published salary.  When Kirpalani filed an administrative appeal of this decision, the administrative law judge (ALJ) agreed with staff's position, and appellant Board of Administration of PERS (Board) adopted the ALJ's order.  In a subsequent writ proceeding, the trial court reversed the Board and set Kirpalani's pensionable compensation at an amount between her final year salary and the published salary.  We reverse the trial court's judgment and affirm the Board's finding that Kirpalani's pensionable compensation was limited to the published salary for her position.

## I. BACKGROUND

At the end of her 27-year career with the district in school year 2005–2006, Kirpalani was employed as the "Chief Business Official." Under her written employment contract with the district for that year (contract), Kirpalani was paid a total of $165,396, consisting of a salary of $148,069, an "annuity" of $7,403, and $9,924 paid "in lieu of any fringe benefits." The contract required Kirpalani to retire before the beginning of the subsequent school year and, as an incentive for her "early retirement," granted her two years of "additional service credit." The PERS retirement contributions made by and on behalf of Kirpalani were based on the total amount of cash compensation stated in the contract.

In September 2006, PERS notified the district that it did not consider the entirety of Kirpalani's pay to qualify as "compensation earnable" under Government Code[1] section 20636, the amount of compensation on which retirement benefits are calculated. As PERS explained its reasoning in a letter, the district's published salary schedule set the compensation of the Chief Business Official at $140,000, rather than the $148,069 granted by Kirpalani's contract. Under section 20636, subdivision (b), the published schedule, rather than the contract, determined her base pay for purposes of calculating compensation earnable. Further, PERS had concluded the additional amounts paid as an annuity and in lieu of fringe benefits did not qualify as "special compensation" under section 20636, subdivision (c), and therefore did not add to Kirpalani's compensation earnable. As a result, PERS informed the district, it considered Kirpalani's compensation earnable for school year 2005–2006 to be $140,000. The district was unsuccessful in persuading PERS otherwise.

Kirpalani appealed PERS's decision, and the matter was assigned for hearing to an ALJ. Over the course of two hearings, held in October 2008 and January 2010, Kirpalani

---

[1] All statutory references are to the Government Code unless otherwise indicated.

2

explained the circumstances surrounding the contract.[2]  In the decade prior to her retirement, the district had undertaken several construction projects whose costs far exceeded the proceeds of the bonds issued to finance them.  In the scramble to cover the short-fall, Kirpalani and her boss, the district superintendent, alienated certain school board members.  The superintendent was fired, and his replacement, an interim superintendent, told Kirpalani she was next.  Because she had not yet reached her intended retirement age, Kirpalani resisted, demanding a salary of $165,000 and the two-year "golden handshake," the grant of two additional years of retirement service credit, in return for her early retirement.  The result was the compensation plan reflected in the contract.

Kirpalani acknowledged the total compensation she received under the contract for school year 2005–2006 exceeded the published salary for her position by $25,396.  She said the portion characterized in the contract as an annuity had been paid to her since the 2003–2004 school year as additional compensation.  In that year, the former superintendent, concerned about the many construction project cost overruns, asked Kirpalani to begin "oversee[ing] construction," in light of her "expertise in managing budgets."  She demanded additional compensation, and, beginning in that year, her actual salary had exceeded the published salary.

Kirpalani denied receiving any additional salary as an incentive to retire.  She contended the quid pro quo in the contract given in return for her agreement to retire was not the additional compensation but the "two-year golden handshake."   Kirpalani contended the published salary schedule reflected the salary for the vacant position following her retirement, rather than her personal salary.

A deputy superintendent for the district confirmed that Kirpalani retired "because she was offered a package to leave," which was reflected in her contract.  He said it was

---

[2] Following the October 2008 hearing, the ALJ issued a decision affirming the staff's position.  After initially adopting that decision, the Board granted requests for reconsideration filed by the district and Kirpalani and remanded the matter for further factual findings.

anticipated that she would purchase health and dental insurance with the $9,924 labeled in lieu of fringe benefits. Although the additional $7,403 was characterized as an "annuity" in the contract, there was no annuity, as that term is commonly understood. The deputy superintendent said it was merely "added to salary and paid in cash as part of the monthly salary." He confirmed that in the two prior years Kirpalani was given additional compensation for overseeing the construction. He said that although the position reflected in the published salary schedule may have been vacant for a portion of the school year, it also covered the position for Kirpalani's final year.

Kirpalani was permitted to introduce a declaration by her former boss, the former superintendent, stating that, in 2004, he granted Kirpalani salary equal to 5 percent, or $6,715, above the published rate for her position "for her special skills, knowledge, abilities, and work assignment." He confirmed "part" of this "Management Incentive Pay" was "associated with overseeing construction budgets." The extra pay was reflected in her employment contract, executed in 2004. The superintendent stated that two assistant superintendents, who as management employees were similarly situated to Kirpalani, also received 5 percent more than the published salary schedule for their positions during this time.

The ALJ issued a proposed decision in July 2010, following the second round of hearings. The ALJ found that, as an inducement for Kirpalani to retire rather than face termination, the interim superintendent "promised [she] would receive a golden handshake and that for purposes of fixing an attractive retirement pension income her salary . . . would be reflected as $165,000 per annum." Because the contract "was negotiated in contemplation of [Kirpalani's] mutually agreed separation from employment," the ALJ held the compensation "must be characterized as 'final settlement pay.' " Addressing Kirpalani's claim to have received management incentive pay, the ALJ noted she had not described her compensation in excess of $140,000 in that manner when testifying at the first hearing. He accepted PERS's position that the amount failed to qualify as management incentive pay because it was not contained in a written labor policy agreement, was not available to all members in her group or class, and was, in fact,

4

final settlement pay. The ALJ also noted the amount was never reported to PERS as management incentive pay. The Board adopted the ALJ's decision and rejected Kirpalani's subsequent petition for reconsideration.

In March 2011, Kirpalani filed a petition for a writ of administrative mandamus challenging the Board's decision. In her petition, Kirpalani alleged the $8,069 of her actual salary in excess of the published salary and the $7,403 characterized as an annuity in the contract qualified as special compensation and, on that basis, sought an order finding her pensionable compensation to be $155,472.

The trial court rejected the positions of both parties, setting Kirpalani's pensionable compensation at $150,939 and directing the Board to calculate and refund to Kirpalani the excess contributions she had made to PERS. Explaining its rationale, the court held it could not rely on the contract in setting Kirpalani's pensionable compensation because it "is part of a golden hand shake agreement." Instead of the published salary schedule, the court turned to the salary specified in her earlier employment contract, $150,939, to determine her pensionable compensation. The court appears to have deemed the excess of Kirpalani's salary above the published salary to constitute special compensation, since it noted "the Board is incorrect in not considering the special compensation."

## II. DISCUSSION

PERS contends the ALJ and the Board were correct in concluding Kirpalani's compensation earnable was limited to the amount specified in the published salary schedule. As she did before the trial court, Kirpalani argues $15,472 of her salary in excess of the published amount should be deemed special compensation includable in her compensation earnable.[3]

---

[3] Although Kirpalani contends her pensionable compensation should be set at $155,472, or more than $5,000 above the amount in the trial court's decision, Kirpalani did not file an appeal of the trial court's judgment. As a result, she forfeited her right to raise affirmative error in the judgment, and her pensionable compensation, even if she were successful, would be limited to the amount specified in the judgment. (E.g., *Kardly v. State Farm Mut. Auto. Ins. Co.* (1995) 31 Cal.App.4th 1746, 1748–1749, fn. 1.)

5

In ruling on a petition for an administrative writ of mandamus challenging a decision of the Board, the trial court is "required to exercise its independent judgment in reviewing the evidence admitted at the administrative hearing to determine whether such evidence supported CalPERS's findings." (*Molina v. Board of Administration, etc.* (2011) 200 Cal.App.4th 53, 60–61 (*Molina*).) Our role is to "review the trial court's factual findings to determine whether such findings were supported by substantial evidence." (*Id.* at p. 61.)

On the other hand, we review issues of law de novo. (*Molina, supra,* 200 Cal.App.4th at p. 61.) In doing so, we give great weight and respect to the views of the agency on the interpretation of its governing statutes, while recognizing the ultimate responsibility for the construction of the statute is ours. (*Southern California Cement Masons Joint Apprenticeship Committee v. California Apprenticeship Council* (2013) 213 Cal.App.4th 1531, 1542; *City of Sacramento v. Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1478 (*City of Sacramento*).)

## A. PERL

"The Public Employees' Retirement Law (PERL, Gov. Code, § 20000 et seq.) establishes PERS, a retirement system for employees of the state and participating local public agencies. PERS is a prefunded, defined benefit plan which sets an employee's retirement benefit upon the factors of retirement age, length of service, and final compensation. [Citation.] . . . An employee's compensation is not simply the cash remuneration received, but is exactingly defined to include or exclude various employment benefits and items of pay." (*Oden v. Board of Administration* (1994) 23 Cal.App.4th 194, 198, fn. omitted.) "Under the PERL, the determination of what benefits and items of pay constitute 'compensation' is crucial to the computation of an employee's ultimate pension benefits. The pension is calculated to equal a certain fraction of the employee's 'final compensation' which is multiplied by a fraction based on age and length of service. [Citations.] 'Final compensation' is the 'highest average annual compensation earnable by a member during the three consecutive years of employment immediately preceding the effective date of his retirement' or other

6

designated consecutive three-year period." (*City of Sacramento, supra,* 229 Cal.App.3d at pp. 1478–1479, fns. omitted.)

**B.** *Kirpalani's Payrate*

" 'Compensation earnable,' " the portion of a member's pay on which his or her pension benefit is calculated (§ 20037), is defined by section 20636, subdivision (a), as the member's "payrate and special compensation."[4] " 'Payrate' " is defined in relevant part as "the normal monthly rate of pay or base pay of the  member paid . . . to similarly situated members of the same group or class of employment for services rendered on a full-time basis during normal working hours, pursuant to publicly available pay schedules." (§ 20636, subd. (b)(1).)  For members who are not in a group or class of employment, as appears to be the case with Kirpalani, "payrate" is materially the same, defined as "the monthly rate of pay or base pay of the member, paid in cash and pursuant to publicly available pay schedules, for services rendered on a full-time basis during normal working hours." (§ 20636, subd. (b)(1).)

Kirpalani appears not to dispute that her payrate is $140,000, the salary listed for her position in the district's published salary schedule.  The language of section 20636, subdivision (b) is unambiguous in this regard:  an employee's payrate is not determined by his or her actual compensation, but by "the monthly rate of pay . . . pursuant to publicly available pay schedules."  PERS regulations implementing this section make the point more directly, holding that "[f]or purposes of determining the amount of 'compensation earnable' . . . payrate *shall be limited* to the amount listed on a pay schedule." (Cal. Code Regs., tit. 2, § 570.5, subd. (a), italics added.)

---

[4] PERS has applied section 20636 to this matter throughout, and Kirpalani has not objected to that application.  We note that if Kirpalani, the employee of a school district, qualifies as a "school member" under PERL, the applicable statute would be section 20636.1, not section 20636.  In the absence of a factual record necessary to determine whether Kirpalani satisfies the definition of a "school member," contained in sections 20063 and 20370, subdivision (d), we assume PERS is correct.  The parties have, in any event, waived the right to assert section 20636.1 by failing to raise the issue in their respective briefs.  (E.g., *People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14.)

To qualify for consideration under section 570.5 of California Code of Regulations, title 2, a "pay schedule" must, among other requirements, set out each position and its associated pay and be "posted at the office of the employer or immediately accessible and available for public review." (*Id.*, subds. (a)(1)–(8).) The district's public salary schedule relied on by PERS in setting Kirpalani's payrate satisfied these requirements. In contrast, neither Kirpalani's employment contract nor the internal district document listing her actual salary from the prior year, on which the trial court relied, satisfy the requirements of section 570.5 for a pay schedule. As a matter of law, therefore, Kirpalani's payrate was $140,000, the amount set out in the district's published salary schedule.

## C. *Special Compensation*

Because compensation earnable is limited to payrate and special compensation (§ 20636, subd. (a)), if Kirpalani's compensation earnable is to exceed $140,000, the excess must qualify as "special compensation."

Like payrate, special compensation is carefully defined by section 20636. "Not all items of compensation paid in addition to the member's base salary count as pensionable special compensation. To qualify as special compensation, the payment must be received (1) 'for special skills, knowledge, abilities, work assignment, workdays or hours, or other work conditions'; (2) 'pursuant to a labor policy or agreement' applicable to a group or class of similarly situated employees; [and] (3) 'for services rendered during normal working hours.' (§ 20636, subd. (c)(1), (2), (3).) Further, pensionable special compensation includes only payments the PERS board has 'affirmatively determined to be special compensation,' as reflected in board regulations promulgated for that purpose. (§ 20636, subd. (c)(6), (7); Cal. Code Regs., tit. 2, § 571, subds. (a), (d) (Regulation 571).)" (*City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 527.)

In *Prentice v. Board of Administration* (2007) 157 Cal.App.4th 983 (*Prentice*), the court considered a situation quite similar to that of Kirpalani. The petitioner in *Prentice*, a longtime management employee of a city's utility department, was appointed to head a

8

newly created department. At the time of his appointment, the petitioner was given a 10.49 percent pay raise that exceeded the pay raises available to other similarly situated employees and was therefore ineligible for inclusion in compensation earnable. The city sought and was denied an exemption. Two years after taking the position, the petitioner retired. (*Id.* at p. 987.) When PERS declined to include the 10.49 percent raise in the petitioner's final compensation, he challenged the decision, claiming the raise qualified as "special compensation." The court rejected the argument because, contrary to section 20636, "[t]he increase Prentice received was neither the subject of a written labor policy or agreement nor available to all members of the management confidential group." (*Prentice*, at p. 995.) In discussing its conclusion, the court noted, "[T]he fact [Prentice's] raise was the subject of a written memorandum from the city manager to the human resources department did not satisfy the requirement that it be set forth in a written labor policy or agreement. A written *employment* agreement with an individual employee is not a *labor* policy or agreement within the meaning of the regulation. As used in the regulation, the term 'labor' modifies both 'policy or agreement,' and implicitly restricts the referenced policies or agreements to either policies which cover a whole class of employees or collective bargaining agreements. This restricted and more literal reading of the regulation is required because the broad interpretation offered by Prentice would essentially provide no limit on the compensation a local agency could provide to individual employees by way of individual agreements. [¶] More importantly, even if we treated the memorandum as a 'labor policy' or 'labor agreement' within the meaning of the regulation, the increase Prentice received would still fail to meet the requirements of the regulation. The record is undisputed the increase was not available to all other members of the Management Confidential group as required by [Regulation 571, subdivision (b)(2)], or in any sense historically consistent with prior payments to members of the group within the meaning of California Code of Regulations, title 2, section 572, subdivisions (a)(5) and (b)(5)." (*Ibid.*, fn. omitted)

Kirpalani's claim that her excess compensation constituted special compensation fails for the same reason. Under Regulation 571, a document qualifies as a labor policy

9

or agreement only if it "[i]ndicates the conditions for payment of the item of special compensation, including, but not limited to, eligibility for, and amount of, the special compensation" and "[i]s posted at the office of the employer or immediately accessible and available for public review from the employer during normal business hours or posted on the employer's internet website." (Reg. 571, subd. (b)(1)(B) & (C).) The only document cited by Kirpalani that could possibly qualify as a written labor policy or agreement authorizing her claimed special compensation, the contract, does not actually mention special compensation, let alone indicate "the conditions for payment" of it, and there is no indication in the record it was posted or immediately accessible for public review at the district. As *Prentice* suggests, and Regulation 571 confirms, to qualify as special compensation payments must be made pursuant to a general written policy whose conditions are established in advance, rather than on the ad hoc basis claimed by Kirpalani.

We note that even if the payments had been paid pursuant to a labor policy or agreement, they likely would not have qualified as special compensation. Under Regulation 571, compensation cannot qualify as special compensation if it is paid "exclusively in the final compensation period." (*Id.*, subd. (b)(7).) As Kirpalani testified, the special compensation she claimed for overseeing construction was paid to her only in the last three years of her employment, which appears to have coincided with the final compensation period.

Because we conclude there is no substantial evidence to support the trial court's finding of special compensation, we need not address PERS's argument that the payments should be disallowed as final settlement pay.

**D.** *Contribution Refunds*

PERS also asks us to reverse the portion of the trial court's judgment directing it to refund to Kirpalani the excess payments she presumably made in purchasing additional retirement service credit.

As recognized by the trial court in its judgment, Kirpalani made two types of payments to PERS calculated on the basis of the salary paid to her in the 2005–2006

10

school year:  the pension contributions made in connection with her periodic salary payments and the purchase price for five years of additional retirement service credit. Because Kirpalani's 2005–2006 salary substantially exceeded her compensation earnable, it is likely both types of payments exceeded the payments that were actually due.[5]  The trial court's judgment accordingly directed PERS to calculate and refund both types of presumed overpayments.

PERS does not dispute that Kirpalani is due a refund in connection with these payments.  Nor does PERS contest the portion of the trial court's writ that directed it to calculate and refund Kirpalani's excess periodic pension contributions.  However, PERS contends Kirpalani failed to exhaust her administrative remedies with respect to the portion of the trial court's order directing it to refund the presumed excess purchase price for the additional retirement service credit, arguing that issue was not raised in the statement of issues filed by PERS in connection with Kirpalani's appeal.

While we recognize the ALJ and the Board did not expressly address the service credit issue below, we believe Kirpalani has adequately exhausted her administrative remedies with respect to this issue.  PERS regulations authorize the grant of a refund for excess contributions and prescribe a method for seeking a refund by "written application."  (Cal. Code Regs., tit. 2, §§ 555, 575.)  Kirpalani's notice of appeal filed with PERS, which initiated this proceeding, addressed her purchase of additional retirement service credit.  Although the notice did not expressly request a refund, since the purpose of the appeal was to challenge the PERS decision on which a refund would be based, a decision adverse to Kirpalani on the appeal necessarily implied that she had overpaid for the service credit.  Her mention of the service credit purchase in the notice of appeal was therefore sufficient to raise the issue of overpayment.  We see no purpose in requiring Kirpalani to file a formal request for a refund and begin the process anew in connection with her service credit purchase.

_____

[5] While we recognize the likelihood that Kirpalani overpaid in connection with her periodic contributions and her service credit purchase, we make no finding to that effect. That is a determination left to PERS as an initial matter.

## III.  DISPOSITION

The portions of the trial court's judgment based on its determination of compensation earnable are reversed.  The matter is remanded to the trial court with instructions to vacate its judgment and enter a new judgment consistent with our decision, based on compensation earnable of $140,000.


_____
Margulies, Acting P.J.


We concur:


_____
Dondero, J.


_____
Banke, J.

12