Filed 6/28/16

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JOSEPH TANNER,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA PUBLIC EMPLOYEES'<br>RETIREMENT SYSTEM et al.,<br><br>    Defendants and Respondents. | C078458<br><br>(Super. Ct. No.<br>34201380001492CUWMGDS) |

APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne W. L. Chang, Judge.  Affirmed.

Law Offices of John Michael Jensen and John Michael Jensen for Plaintiff and Appellant.

Reed Smith, Harvey L. Leiderman and Jeffrey R. Rieger for Defendants and Respondents.

In this "pension spiking" case, Plaintiff Joseph Tanner sought to overturn a decision of defendant California Public Employees' Retirement System (CalPERS) significantly reducing his expected retirement benefit.

Specifically, Tanner argues his retirement benefit should be set based on a base salary of $305,844, which was provided for in his final written contract with the City of Vallejo. The Board of Administration of CalPERS (also a defendant in this action) decided Tanner was not entitled to have his retirement benefit based on that figure. On Tanner's petition for a writ of administrative mandate, the trial court agreed with the board, holding (among other things) that the $305,844 figure could not be used as Tanner's final compensation for purposes of setting his retirement benefit because it did not qualify as his payrate due to the fact that the figure did not appear on a publicly available pay schedule.

On Tanner's appeal, we agree with the trial court that neither Tanner's final contract with the city nor a chart prepared by city staff to show how Tanner's final base salary was determined qualified as a publicly available pay schedule for purposes of determining the amount of Tanner's final compensation and, in turn, the amount of his retirement benefit. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

By virtue of his employment with a number of California cities over the years, up to and including his employment as city manager of the City of Pacifica, Tanner was a miscellaneous member of CalPERS.

In November 2006, while still employed by Pacifica, Tanner entered into a written agreement with the City of Vallejo to serve as that city's manager for a term of three years, from January 8, 2007, through January 7, 2010. Under the terms of that agreement, Tanner was to serve initially as a limited term employee not enrolled in CalPERS but was to become a permanent employee and be reinstated in CalPERS on or before March 8, 2007.[1] The agreement provided that Tanner's base annual salary was to

---

[1] The reason for this initial period of limited term employment is not entirely clear from the record, but it is also irrelevant for our purposes.

2

be $216,000, but he was also to receive certain other types of compensation, including (as relevant here) the following:

1) A monthly automobile allowance of $600 that was to "be converted to base salary after March 8, 2007";

2) A monthly contribution to a deferred compensation plan equal to 15 percent of his base salary, which the city was to "convert . . . to base salary upon reinstatement to [Cal]PERS";

3) 30 days of management leave per year, which was to "be paid as salary";

4) 240 hours of annual leave per year, with the right to sell back to the city up to 120 hours of accrued leave each year; and

5) The city's payment of Tanner's share of the required contribution to CalPERS, which, at the city's option, could be "converted to base salary."[2]

Tanner ended his employment with the City of Pacifica effective January 8, 2007, and began working for the City of Vallejo that same day.

Vallejo city staff forwarded the November 2006 contract to CalPERS, and CalPERS responded in a letter dated January 26, 2007. CalPERS acknowledged that Tanner's base salary qualified as reportable compensation for purposes of retirement. With respect to the first three items of compensation identified above, however, CalPERS explained that the Government Code provision defining reportable compensation did "not allow for converting additional compensation into base pay or adding non reportable compensation to base pay for retirement purposes. Thus, payments such as management leave credits; automobile allowance; and deferred compensation should not be converted

---

**2**     This sort of payment is referred to as employer paid member contributions. Tanner's required contribution to CalPERS was 8 percent of his salary, with the city contributing another 1 percent. Thus, under this provision, the city was to pay Tanner's 8 percent contribution for him or pay him an equal amount as additional salary.

3

to salary and reported to CalPERS for retirement purposes." With regard to the employer paid member contributions, CalPERS explained that this amount could be reported to CalPERS provided that the city adopted "the appropriate resolution for a group or class of employees" and that the agreement "should be amended to reflect this provision." With regard to the provision for selling back annual leave, CalPERS pointed out that "[t]he City already provides management incentive pay to other management staff, 120 hours per year at their hourly rate of pay," but the California Code of Regulations "states that employees can not [*sic*] be granted the option of either taking time off or receiving pay. Therefore, in order for the City Manager's 'sell back of 120 hours of accrued leave' to qualify as management incentive pay, the option of time off or receiving cash payment must be taken out of the Managers [*sic*] contract and replaced by a management incentive pay clause similar to that found in the City's Memorandum of Understanding (MOU) for other management staff."

Following receipt of the letter from CalPERS, city staff undertook to create a new class or group of employees, to be known as the "Council Appointed Executive Staff," which would consist of the city manager and the city attorney. City staff also drafted a new employment agreement for Tanner that was to be entered into as of March 8, 2007, the date Tanner's employment was to become permanent under the original agreement. Under the new agreement, Tanner's base salary was to be $305,844. The contract also provided that the city would pay Tanner's portion of the contribution to CalPERS. There were no provisions, however, for an automobile allowance, deferred compensation, management leave, or annual leave sell-back. The March 2007 agreement specifically provided that it superseded the November 2006 agreement and contained a clause declaring that the March 2007 agreement represented the entire agreement of the parties.

At a meeting on March 27, 2007, the city council authorized the mayor to amend Tanner's employment agreement " 'to comply with CalPERS regulations' " and

4

authorized the city to pay the member contributions of the two employees in the "Council Appointed Executive Staff."

As of May 8, 2007, the mayor still had not signed the March 2007 agreement. On that date, the city's human resources operations manager, Debora R. Boutte, sent a memo to the mayor requesting that he authorize the agreement. In part, the memo explained that city staff had amended the employment agreement "to comply with [CalPERS] regulations without changing the total cost of the original employment agreement . . . . The necessary amendments involved moving the additional costs of the car allowance, deferred compensation, management leave and 1% of the Employment Paid Retirement Contribution be added [sic] to the base [salary] versus being reported separately as additional pay.[3] This change resulted in the base salary going from $216,000 to $305,844." The memo was accompanied by a document entitled "City Manager [¶] Salary Computation [¶] March 8, 2007," which Boutte referred to as a cost analysis, that showed how Tanner's new base salary was determined by adding to the original base salary the values of the automobile allowance, the deferred compensation, the management leave, the employer's share of the CalPERS contribution, and the annual leave sell-back.[4] While the cost analysis showed the new base salary, it did so among numerous other figures.

Sometime after Boutte sent these materials to the mayor, the mayor signed the March 2007 agreement. Ultimately, CalPERS reinstated Tanner effective March 8, 2007, thus allowing him to begin accruing service credit again.

---

**3** In communications following the January 2007 letter, CalPERS had explained to city staff that the employer's 1 percent share of the contribution to CalPERS was not reportable compensation for purposes of retirement and could not be converted into base salary.

**4** We will refer to this document as the cost analysis.

5

Two years later, Tanner resigned his employment with the city effective June 1, 2009. He submitted an application for service retirement with CalPERS effective the next day and reported his highest compensation period as June 1, 2007 to May 31, 2008.

In December 2009, CalPERS notified Tanner that it would compute his retirement benefit based on his original base salary of $216,000 in the November 2006 agreement rather than the increased base salary in the March 2007 agreement. Tanner appealed that decision in February 2010.[5] The matter was heard by an administrative law judge over 10 days between November 2011 and May 2012.

In November 2012, the administrative law judge issued a proposed decision denying Tanner's appeal, and in February 2013, the board adopted that proposed decision as its own (with three minor changes). In the decision, the board concluded that Tanner's "compensation earnable for purposes of calculating his retirement benefits cannot include amounts previously paid to [him] as an automobile allowance, employer paid deferred compensation, 30-day leave allowance, one percent employer portion of PERS contributions, or 120-hour annual leave cash out option."

The board denied Tanner's petition for reconsideration in April 2013, and in May 2013 Tanner filed a petition for a writ of administrative mandamus in the superior court. In January 2015, the trial court entered its judgment denying Tanner's writ petition. In its ruling, the trial court noted that, to show that CalPERS had abused its discretion in determining that Tanner was not entitled to have his retirement benefit based on the increased base salary in the March 2007 agreement, Tanner had to "establish that the $305,844 was his 'pay rate.' " The court concluded that Tanner could not "legitimately

---

[5] Tanner's appeal does not appear in the administrative record, as far as we can determine, but there are references to it in Tanner's prehearing conference statement and CalPERS's statement of issues in the administrative proceeding.

6

claim that his salary of $305,844 [wa]s 'pay rate,' because [Tanner] has not shown that this salary was on a publicly available 'pay schedule.' "[6]

Tanner timely appealed.

DISCUSSION

I

*Contract Arguments*

Tanner spends much of his opening brief arguing that the trial court erred by failing to properly apply contract principles, such as reformation for mistake and the parole evidence rule. In essence, Tanner's argument appears to be that under contract principles, he and the city made a mutual mistake in entering into the November 2006 agreement because they thought all of his compensation in that agreement could be used to calculate the amount of his retirement benefit, and when CalPERS informed them otherwise, they reformed the agreement to achieve their original intent by folding various miscellaneous items of compensation in the November 2006 agreement into his new, greater base salary in the March 2007 agreement. In Tanner's view, because the March 2007 agreement was an integrated contract that superseded and replaced the November 2006 agreement, CalPERS and the trial court could not lawfully construe the later agreement by referring to the earlier, superseded agreement.

As we will explain, however, we conclude Tanner's appeal is without merit regardless of these contract arguments, or any of the other arguments Tanner makes. This is so because we agree with the trial court that the greater base salary in the March

---

**6** The trial court also concluded that the additional items of compensation from Tanner's November 2006 contract that were folded into the new base salary in his March 2007 contract did not qualify as "special compensation" that could be added to the pay rate in the earlier contract for purposes of calculating Tanner's retirement benefit, but Tanner never actually made such an argument. Instead, his contention was that the base salary in his March 2007 agreement was the payrate on which he was entitled to have his retirement benefit calculated.

7

2007 agreement did not qualify as Tanner's payrate for purposes of calculating the amount of his retirement benefit because that salary was not paid pursuant to a publicly available *pay schedule*. For this reason, Tanner has no right to have his retirement benefit calculated based on that greater base salary.

II

*The Public Employees' Retirement Law*

Under the Public Employees' Retirement Law (Gov. Code, § 20000 et seq.), "[t]he formula for determining a member's retirement benefit takes into account (1) years of service; (2) a percentage figure based on age on the date of retirement; and (3) 'final compensation' . . . ." (*City of Sacramento v. Pub. Employees Ret. Sys.* (1991) 229 Cal.App.3d 1470, 1478, fn. 5.) As used in the Public Employees' Retirement Law, " 'compensation' means the remuneration paid out of funds controlled by the employer in payment for the member's services performed during normal working hours or for time during which the member is excused from work" for certain reasons not relevant here. (Gov. Code, § 20630, subd. (a).) Compensation reported by the employer to CalPERS "shall not exceed compensation earnable, as defined in Section 20636." (Gov. Code, § 20630, subd. (b).)

" 'Compensation earnable' by a member means the payrate and special compensation of the member, as defined by subdivisions (b), (c), and (g), and as limited by Section 21752.5." (Gov. Code, § 20636, subd. (a).) " 'Payrate' means the normal monthly rate of pay or base pay of the member paid in cash to similarly situated members of the same group or class of employment for services rendered on a full-time basis during normal working hours, pursuant to *publicly available pay schedules*. 'Payrate,' for a member who is not in a group or class, means the monthly rate of pay or base pay of the member, paid in cash and pursuant to *publicly available pay schedules*, for services rendered on a full-time basis during normal working hours, subject to the limitations of paragraph (2) of subdivision (e)." (Gov. Code, § 20636, subd. (b)(1), italics added.)

8

Based on the foregoing statutes, whether an employee is a member of a group or class of employees, the employee's normal monthly rate of pay or base pay must be paid in cash pursuant to a *publicly available pay schedule* in order to qualify as payrate and thus as "compensation earnable" that can be reported to CalPERS for use in the calculation of the employee's retirement benefit.

The question of what does or does not constitute a publicly available pay schedule has been addressed in only two published decisions.

In *Prentice v. Board of Administration* (2007) 157 Cal.App.4th 983 (*Prentice*), "a local municipality decided to provide the manager of its water and power department with a 10.49 percent salary increase during what turned out to be the last two years of his career. Although the municipality had a salary range for the manager's position which would have applied to anyone else who filled the position, the municipality did not alter the salary range to reflect the increase and it was not otherwise available to other employees in the same class as the manager. In light of these circumstances, [Cal]PERS did not include the salary increase in calculating the manager's retirement allowance. The manager then challenged [Cal]PERS's decision by way of a petition for a writ of mandate, which the trial court denied." (*Id.* at p. 986.)

On Prentice's appeal, the appellate court concluded the salary increase was not part of Prentice's payrate because "the increase Prentice received was never part of a published pay schedule within the meaning of [Government Code] section 20636, subdivision (b)(1)" in that "the city consistently excluded the increase from the salary range available for Prentice's position." (*Prentice*, *supra*, 157 Cal.App.4th at p. 994.) The appellate court went on to reject the argument that disclosure of Prentice's full salary in the city's annual budget was sufficient to satisfy the statute, observing as follows: "Admittedly, as Prentice points out, his full salary would have been available to anyone examining the city's annual budget. However, as a practical matter, inclusion of a provisional or temporary salary in a budget document would not have afforded any other

9

person holding the position the right to receive the same increase, where, as here, the city itself consistently recognized that the salary range did not include the raise.  Because, as we view the entire statutory scheme, the limitations on salary are designed to require that retirement benefits be based on the salary paid to similarly situated employees, [Cal]PERS acted properly in looking at the published salary range rather than the exceptional arrangement the city made with Prentice and reflected in the city's budget documents.  The defect in Prentice's broad interpretation of 'pay schedule' is that it would permit an agency to provide additional compensation to a particular individual without making the compensation available to other similarly situated employees."  (*Id.* at p. 994.)

In *Molina v. Board of Administration* (2011) 200 Cal.App.4th 53 (*Molina*), a former public employee "sought to compel the inclusion in the calculation of his retirement pension all, or at least some portion of, the settlement proceeds received in the negotiated resolution of his wrongful termination action against the City of Oxnard."  (*Id.* at p. 56.)  The trial court denied his writ petition, and the appellate court affirmed.  (*Ibid.*)  In doing so, the appellate court explained as follows:  "Molina fails to recognize the important difference between the amount he was paid by Oxnard (i.e., the settlement proceeds), which may be subject to income taxes, and the much narrower category of 'compensation earnable' that can be taken into account for pension purposes, as established under [the Public Employees' Retirement Law].  Because, under [the Public Employees' Retirement Law], even if a portion of the settlement amount had been labeled back pay and was includible in taxable income, it could not be included in Molina's 'payrate' because there was no evidence that the amount was either (1) paid to similarly situated employees or (2) paid in accordance with a 'publicly available pay schedule[ ] . . . for services rendered on a full-time basis during normal working hours.' "  (*Id.* at p. 67.)

10

In the trial court here, CalPERS argued there was "no basis to distinguish the present case from *Prentice* and *Molina*. The only documents that list Tanner's salary as $305,844 are his amended contract and the May 8, 2007, documents relating to that amended contract. Just like the budget documents in *Prentice* and the settlement agreement in *Molina*, Tanner's amended contract and the May 8, 2007 documents do not qualify as a 'pay schedule.' These documents relate only to Tanner personally, without listing any other position or person. There is no evidence that the City Council ever voted to adopt any of these documents for any purpose, much less adopt them as 'pay schedules.' "

The trial court agreed with CalPERS on this point, finding that Tanner's claimed base salary of $305,844 did not appear on any publicly available pay schedule. In response to Tanner's argument that the cost analysis was his pay schedule, the trial court noted that the city "made an exceptional arrangement with [Tanner] to provide him significant compensation" that was "well above the salary paid to the last Vallejo City Manager." The court also observed that the cost analysis "differs from the 'pay schedules' for other groups or classifications of City employees," in particular, the document showing "the salary information for Department Heads and Executive Assistants." The court pointed out that the cost analysis Tanner claimed was his pay schedule was "specific to him only, in that it is dated 'March 8, 2007' and pertains only to the City Manager." Finally, the court concluded that Tanner's "broad interpretation of 'pay schedule' would permit an agency to provide additional compensation to a particular high-ranking official, any time it made a document with his specific pay information 'publicly available,' " and the court did "not believe that the Legislature intended such a broad construction of 'pay schedule.' "

On appeal, Tanner contends the city "satisfied the publicly available pay schedule 'requirement' as it existed in 2007" because "Boutte testified that the [cost analysis] was a pay schedule and that it was provided to the public" and because the city's human

11

resources director, Dennis Morris, "also testified that the City Manager's contract was [Tanner's] pay schedule." This argument is not persuasive for several reasons.

First, the question of whether the $305,844 base salary in Tanner's March 2007 agreement was paid pursuant to a publicly available pay schedule within the meaning of Government Code section 20636, subdivision (b)(1) is a question of law because it involves "[t]he proper interpretation of a statute, and its application to undisputed facts." (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 722.) Here, the facts are undisputed that Tanner's $305,844 base salary appeared in the March 2007 agreement and in the related cost analysis and both of those documents were publicly available. Thus, the question of whether either or both of those documents qualified as a pay schedule, as the Legislature intended that term in Government Code section 20636, subdivision (b)(1), is a question of law that we review de novo. The fact that Boutte may have characterized the cost analysis as a pay schedule and Morris may have characterized the March 2007 agreement as a pay schedule has very little bearing on our analysis of that legal question.

Second, even if we were to give weight to the testimony of Boutte and Morris on the question of whether the cost analysis or the March 2007 agreement qualifies as a pay schedule, it turns out their testimony is far less supportive of Tanner's argument on this point than he lets on. On the first day of the administrative hearing, Boutte testified that the city manager and city attorney positions are different from other positions within city employment because those two positions are filled only by the city council, which does not hire any other employees, and those two positions are the only ones that have "actual agreements," i.e., written contracts. When asked how the contracts for those two positions "differ from the way the other employees [are] hired, particularly with respect to published pay scales," Boutte responded, "We do not publish those salaries because they change, based upon what's negotiated between the two parties, the City and that individual. And it changes. And once the document is finalized through a resolution,

12

that becomes publicly [available] but *there is no set salary schedule for City Manager* or City Attorney."  (Italics added.)

Later, when asked "what document contains the compensation for the City Manager," Boutte responded, "The contract, the agreement, the individual agreement. And possibly, the resolution may outline the total."  And after that, when asked if she felt "any need to post the[] pay [of the city manager and city attorney] on a publicly available pay schedule," Boutte responded, "No, I did not."

It was only the following day, while being questioned about the items of compensation in the November 2006 agreement that were not included in the March 2007 agreement, that Boutte spontaneously referenced the cost analysis and described it as "the pay schedule in terms of how we determined the base salary for Mr. Tanner's contract."

In arguing that Boutte testified the cost analysis was a pay schedule, Tanner refers only to her testimony on the second day and ignores completely her testimony on the first day.  Viewed as a whole, however, Boutte's testimony does not support Tanner's argument that Boutte believed the cost analysis qualified or served as a pay schedule.

As for Morris, he testified that a spreadsheet showing the salary ranges for department heads and executive assistants with the city was an appropriate pay schedule because "[a] pay schedule normally has the various steps of the salary range, from the top to the very -- you know, from start to the very top of the range.  Then it's broken down in an hourly, monthly, biweekly basis, that type of thing.  It's pretty standard."  When asked if employees hired by contract at the city are on pay schedules, Morris responded, "Normally, no" because "normally their compensation is only specified in the agreement, in the contract itself."  Morris then testified that the city attorney and the city manager were the only two city positions he could think of that were hired by contract.  This is the testimony to which Tanner refers when he argues that "Morris . . . testified that the City Manager's contract was his pay schedule."  Of course, as can be seen from the testimony itself, which we have set forth in full, Morris testified to no such thing.  Instead, his

13

testimony is more consistent with Boutte's initial testimony, which was that there were no pay schedules for the city's two contract employees: the city manager and the city attorney.

In any event, as we have noted, the question of whether the $305,844 base salary in Tanner's March 2007 agreement was paid pursuant to a publicly available pay schedule within the meaning of Government Code section 20636, subdivision (b)(1) is a question of law, and thus we would not defer to either Boutte or Morris on this question even if their testimony had been more favorable to Tanner than it actually was. On questions of law, we exercise de novo review (*State Water Resources Control Bd. Cases*, *supra*, 136 Cal.App.4th at p. 722), which means we do not defer even to the trial court. Instead, we apply well-known rules of statutory interpretation to determine for ourselves the intended meaning of the statute and the impact of that meaning on the present case.

When interpreting a statute, "we begin with the plain language of the statute, giving the words their ordinary and common meaning. [Citation.] 'If the language is unambiguous, the plain meaning controls,' and no further analysis is warranted. [Citations.] If the language allows more than one reasonable construction, we consider 'such aids as the legislative history of the [statute] and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' " (*State ex rel. Bartlett v. Miller* (2016) 243 Cal.App.4th 1398, 1408.)

Applying these rules here, we conclude that neither of the documents on which Tanner relies qualified as a pay schedule for purposes of determining his final compensation and thus the amount of his retirement benefit. In reaching that conclusion, we begin with the ordinary and common meaning of the word "schedule," which is, in this context, "a written or printed list, catalog, or inventory." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1110, col. 1.) From this definition, and the surrounding context of the statute, we can discern that a *pay* schedule is a written or

14

printed list, catalog, or inventory of the rate of pay or base pay of one or more employees who are members of CalPERS.

Does the March 2007 agreement or the cost analysis meet this definition? No, because neither document qualifies as a list, catalog, or inventory of the rate of pay or base pay of one or more employees. It is true both documents show the base pay the city ultimately agreed to pay Tanner as city manager starting in March 2007, but neither document is limited to that pay information. For its part, the March 2007 employment agreement runs 14 pages and shows *all* of the terms and conditions of Tanner's employment as city manager, with the base salary for the position appearing on page seven of the agreement. As for the cost analysis, that document differs from the employment agreement in that it is only a single page and does not set forth all of the other terms and conditions of Tanner's employment; nonetheless, the cost analysis contains a slew of figures above and beyond Tanner's base salary under the March 2007 agreement, and a member of the public would be hard-pressed to locate the new base salary of the city manager position among all of the other figures on the page and identify it as such.

III

*"Antispiking" Legislation -- Public Disclosure*

Why is this important? Because we discern from the Legislature's use of the term pay schedule an intent to require the employer to use a document (or documents) that isolates the rate of pay or base pay of its employees who are CalPERS members from other employment information and other figures -- with the exception, of course, of the rate of pay or base pay for other such employees. The purpose behind such isolation is apparent, especially in light of the accompanying requirement that such pay schedules are to be made available to the public. A document that catalogs or lists the rate of pay or base pay of one or more employees who are CalPERS members, separate and apart from

15

other information, more readily informs the public of the payrate that will or may be used in determining the amount of an employee's retirement benefit.

That this was the Legislature's purpose -- to facilitate the public disclosure of pay information for public employees who are members of CalPERS -- appears not only from the terms the Legislature used in Government Code section 20636, subdivision (b)(1), but also from the circumstances surrounding the origin of that provision. The term pay schedule first appeared in the Public Employees' Retirement Law in 1993, when the predecessor statute to Government Code section 20636 -- former Government Code section 20023 -- was enacted in place of a previous statute bearing the same section number (Stats. 1993, ch. 1297, § 6, p. 7691) as part of a bill sponsored by CalPERS to address the then "recently uncovered, but apparently widely used, practice of 'spiking' (intentional inflation) the final 'compensation' (upon which retirement benefits are based) of employees of [Cal]PERS local contracting agencies." (Sen. Public Employment & Retirement Com., Analysis of Sen. Bill No. 53 (1993-1994 Reg. Sess.) Mar. 29, 1993, p. 1.) The stated purpose of this part of the new section 20023 was to ensure that payrates would "be stable and predictable among all members of a group or class of employment" and that they would "be publicly noticed b[y] the governing body." (*Id.* at p. 5.)

This purpose would not be served by deeming either the March 2007 agreement or the cost analysis to be a pay schedule. If we were to do so, we would be sanctioning a practice -- including an employee's rate of pay or base pay among any number of other figures or terms and conditions of employment -- that would frustrate, rather than further, the apparent legislative purpose and intent behind the law. Such a result would also deviate substantially from the ordinary and common meaning of the term pay schedule as a list, catalog, or inventory of the rate of pay or base pay of one or more employees.

Based on the foregoing analysis, we conclude that neither of the documents Tanner claims was a pay schedule qualified as such a document under the intended

16

meaning of Government Code section 20636, subdivision (b)(1).  Accordingly, the trial court properly denied Tanner's writ petition on the ground that Tanner has no right to have his retirement benefit calculated based on the base salary in the March 2007 agreement.

## DISPOSITION

The judgment is affirmed.  CalPERS shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


/s/
Robie, J.


We concur:


/s/
Nicholson, Acting P. J.


/s/
Renner, J.

17